IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JIMMIE V. GILES,

    *Plaintiff*,

    v.

BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN,

    *Defendant*.

Civil Action No. ELH-12-634

**MEMORANDUM OPINION**

    Jimmie Giles, plaintiff, is a former professional football player with the National Football League.  Accordingly, he is a beneficiary of the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Plan").  The Plan is an employee pension benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), codified as amended at 29 U.S.C. §§ 1001 *et seq*.  It was established pursuant to collective bargaining agreements between the NFL Players Association and the NFL Management Council in order to provide retirement, disability, and related benefits to eligible former professional football players and their beneficiaries.

    Through the Plan, Mr. Giles currently receives "Inactive" Total and Permanent ("T&P") disability benefits.  However, he unsuccessfully sought "Football Degenerative" T&P disability benefits, which provide greater monthly benefits than the "Inactive" category.  As a result of the denial of the "Football Degenerative" benefits to plaintiff, he has sued the Plan, seeking judicial review of its decision.  *See* Complaint (ECF 1).[1]

---

[1] Suit was initially filed in February 2011 in the United States District Court for the Northern District of Georgia.  On April 4, 2011, the Plan moved to transfer venue to this Court. *See* ECF 7.  The federal court in Georgia granted the motion on February 27, 2012.  *See* ECF 26.

The parties subsequently filed cross-motions for summary judgment, which were fully briefed.[2]  The Court held a motions hearing on May 31, 2012.[3]  For the reasons that follow, the Court will deny both motions and, instead, remand the matter to the Plan's Retirement Board.

## Background[4]

Mr. Giles was born in 1954, and began his professional football career in 1977, when he was drafted by the Houston Oilers.  He played on the offense, in the position of tight end.  For most of his lengthy career in the NFL, Mr. Giles played for the Tampa Bay Buccaneers.  After leaving the Buccaneers, he played for one season with the Detroit Lions, and then retired at the end of the 1989 season, after playing that season for the Philadelphia Eagles.  During his NFL career, Mr. Giles generally weighed between 230 and 240 pounds.  JVG000256.  In the course of his thirteen seasons in the NFL, plaintiff sustained several injuries.

Mr. Giles first applied for T&P disability benefits from the Plan in 1995.  That application was denied.  Thereafter, he applied for and received early retirement benefits from the Plan.  On at least one later occasion, Mr. Giles again applied for T&P disability benefits, but his application was denied because his receipt of early retirement benefits precluded later

---

[2] In particular, I have reviewed the Plan's Motion for Summary Judgment (ECF 40) (collectively with its supporting memorandum, ECF 40-1, "Plan Motion"); plaintiff's Cross-Motion for Summary Judgment ("Giles Motion") (ECF 41); the Plan's reply ("Plan Reply") (ECF 42); and plaintiff's reply ("Giles Reply") (ECF 44).  In addition, the parties jointly submitted the Administrative Record (ECF 20).

[3] The Plan submitted a post-hearing memorandum ("Plan Post-Hearing Memo") (ECF 48).  However, this Memorandum Opinion was prepared without the benefit of a transcript of the motions hearing.

[4] Unless otherwise noted, the facts presented in this Background section are undisputed. They are drawn primarily from the Administrative Record.  As the documents contained in the Administrative Record have been consecutively paginated with Bates numbering using the prefix "JVG," I have cited to the record by Bates page number.

applications for T&P disability benefits.  However, the provisions of the Plan were subsequently

amended to remove that limitation, among other amendments.  Accordingly, in 2008, Mr. Giles

filed another application for T&P disability benefits.  The 2008 application is at issue here.

Ultimately, the 2008 application was granted, but at a lower level of benefit than that to which

Mr. Giles contends he is entitled.  To fully understand the context of the 2008 application, it is

necessary to understand the provisions of the Plan, the facts giving rise to the 1995 application,

and how the Plan's provisions were amended in the intervening time.

A.  The Plan's Provisions for T&P Disability Benefits

The T&P disability benefits are set forth in Article 5 of the Plan.[5]  Under Article 5, a

player is entitled to payment of a monthly T&P benefit if he is otherwise eligible and is

determined to be "totally and permanently disabled as defined in section 5.2" of the Plan.  Plan

§ 5.1.  At the time of Mr. Giles's initial application for T&P disability benefits in 1995, a player

was considered "totally and permanently disabled" under the Plan only if he had "become totally

disabled to the extent that he is substantially prevented from or substantially unable to engage in

any occupation or employment for remuneration or profit," with some further qualifications that

are not applicable here.  Plan § 5.2(a).  In the current version of the Plan, that standard is called

the "General Standard."   As discussed, *infra*, the Plan now contains another, alternative

---

[5] The Plan is governed by a comprehensive document that is also referred to as the "Plan."  *See* JVG000319 *et seq.*  The only version of the Plan that is contained in the record is dated April 1, 2009, *i.e.*, after the filing of Mr. Giles's first application for T&P disability benefits in 1995 (and, indeed, after the filing in 2008 of the application at issue).  However, aside from the particular, important differences that will be discussed, *infra*, the provisions of the Plan relevant to T&P disability benefits apparently have not changed materially since Mr. Giles's first application was filed.

definition of "totally and permanently disabled."  In 1995, however, the General Standard was the sole definition of "totally and permanently disabled."

If a player is found to be totally and permanently disabled, so as to be eligible for the T&P disability benefit, the amount of the benefit depends on which of four categories of benefit applies: "Active Football," "Active Nonfootball," "Football Degenerative," or "Inactive."  Only the latter two categories, "Football Degenerative" and "Inactive," are at issue in this case.  The Football Degenerative category applies "if the disability(ies) arises out of League football activities, and results in total and permanent disability before fifteen years after the end of the Player's last Credited Season."  Plan § 5.1(c).  In contrast, the Inactive category, which entails a lower monthly benefit payment, applies "if (1) the total and permanent disability arises from other than league football activities while the Player is a Vested Inactive Player, or (2) the disability(ies) arises out of League football activities and results in total and permanent disability fifteen or more years after the end of the Player's last Credited Season."  Plan § 5.1(d).

There is no dispute in this case as to whether plaintiff's disability arose within fifteen years after his last credited season.  Rather, as I will explain, his initial 1995 application for T&P disability benefits was denied on the basis that he was not "totally and permanently disabled" within the meaning of the Plan.  Plan § 5.2(a).  The present dispute, arising out of plaintiff's 2008 application for T&P disability benefits, turns on whether plaintiff's disability "arises out of League football activities," so as to qualify for the Football Degenerative category of benefits. Plan § 5.1(c).

Article 5 of the Plan does not include a definition of "aris[ing] out of League football activities."   However, Article 6 of the Plan, relating to the "Line-of-Duty Disability" benefit, contains the following definition:

> "Arising out of League football activities" means a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities.  "Arising out of League football activities" does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities.

Plan § 6.4(c).

The foregoing definition, although taken from the "Line-of-Duty" section of the Plan, has been applied by other courts in cases concerning T&P disability benefits under the Plan.  *See, e.g.*, *Washington v. Bert Bell/Pete Rozelle NFL Retirement Plan*, 504 F.3d 818, 821 n.4 (9th Cir. 2007).  Both sides agree that this definition applies here.

### B.  The 1995 Application for T&P Disability Benefits

As noted, Mr. Giles first applied for T&P disability benefits in 1995.  In preparation for that application, the Plan required, pursuant to Section 5.2(c), that he be examined by Dr. Hugh Unger, M.D., F.A.C.S., a "neutral physician" selected by the Plan.  *See* JVG0034 (letter of Oct. 26, 1995, from Plan Director to Giles).  After examining Mr. Giles in November 1995, Dr. Unger submitted a letter to the Plan summarizing his findings, *see* JVG0045-48, as well as a "Physician's Report" on a form established by the Plan.  *See* JVG0049-50.

Dr. Unger recounted Mr. Giles's lengthy history of injuries sustained while playing football and opined that Mr. Giles had a disability with respect to his back, ankles, and knees. *Id.*  According to Dr. Unger, Mr. Giles could not "get up from his bed without having to sit for a

while because of pain in both knees, his left ankle and his low back." JVG0046.  Dr. Unger

indicated that Mr. Giles's disability was the result of injury sustained in football related activity.

JVG0050.  However, Dr. Unger opined that Mr. Giles was "employable," and was not "totally

disabled to the extent that he is substantially unable to engage in any occupation for any

remuneration or profit." JVG0049.  Dr. Unger stated: "I find no contraindication with the patient

performing an occupation that precludes squatting, kneeling, climbing and lifting over 60

[pounds]." JVG0048.

Mr. Giles submitted his application for T&P disability benefits in December 1995.  *See*

JVG0042.  In addition to Dr. Unger's report, he included with his application the reports of two

other physicians, Dr. David Ascher and Dr. George Adams.  Dr. Ascher conducted Mr. Giles's

NFL end-of-career examination for purposes of disability evaluation.  *See* JVG0043.  Dr. Adams

was Mr. Giles's personal treating physician during the off-seasons from 1986 until his retirement

from football, and on a regular basis thereafter.  *Id.*

Dr. Ascher's report was prepared on February 25, 1991, on the basis of a physical

examination of the same date, conducted within two years after Mr. Giles's retirement from

professional football.  *See* JVG0019-26.  At the time of the examination, Mr. Giles weighed 289

pounds.  *See* JVG0023.  Dr. Ascher recounted a detailed history of Mr. Giles's football injuries,

*see* JVG0019-21, and also provided the following shorter summary of his injury history,

JVG0021:

| | |
|---|---|
| Houston: | Injury to right ankle. |
| Tampa Bay: | Falling on shoulders at various times with injury to both.  Injury to back when struck by another playing.<br>Injury to left knee, 10th or 11th game, 1983.<br>Injury to right knee, early in 1984 season. |

>Tear of left quadriceps.
>Injury to neck, sternum, chest and left shoulder.  Missed one game following this injury.
>Developed bunions on both feet.
>Dislocated right ring finger in a game in Hawaii.
>Was knocked unconscious at least three times.

Detroit:  All symptoms became worse due to artificial turf and cold weather.

Philadelphia:  Bunions.  Neck and shoulder injury.  Injury to left ankle.

At the time of his report, Dr. Ascher described Mr. Giles's "present complaints" as including chronic pain and stiffness in his neck, shoulders, back, knees, and ankles.  In part, Dr. Ascher stated, JVG0022:

>[Mr. Giles's] low back is constantly painful.  The back always hurts in the morning when he first awakens and he must stretch it in order to get started in the morning.  He cannot stand longer than five minutes without moving or leaning [a]gainst something for relief.  He cannot sit for longer than an hour without stretching his legs out in front of him.  Riding in a plane is extremely painful for his back and his knees.  When he drives he must stop every hour or so in order to rest his back.  He is able to walk for about a mile, by which time his back will become painful.
>
>                    *    *    *
>
>Both knees are extremely painful.  There is audible crepitation with any movement.  His knees constantly feel tired.  In February or March of 1990 his right knee gave way on him while he was walking.  After any degree of prolonged sitting both knees become excrutiatingly [sic] painful.  He can no longer jog nor run because of his knees.  Last October both knees just gave way while he was walking from his kitchen to his family room and he fell.  Since then his knees frequently feel like they will give way and he has become conscious of being alert for this.  He is able to play golf, but state he relies on a golf cart to get around.  Any other sports are far too painful for him to attempt.  His left ankle continues to be painful and at times it becomes stiff. . . .  He cannot go up or down stairs without holding on to the railing.
>
>      At home he is able to do very little.  He does no yard work.  He can take the trash out.  He can hit a baseball to his kids and he even coaches Little League, but he cannot participate physically to any degree.  He states that he can take his kids to Disney World, but he cannot walk around with his kids.  He is able to swim.

Dr. Ascher opined that Mr. Giles had a "permanent and stationary" disability.  JVG0024.  Although he indicated that Mr. Giles was "looking for work," Dr. Ascher stated that Mr. Giles was "no longer able to play professional football."  JVG0024.  According to Dr. Ascher, Mr. Giles was "a qualified injured worker": due to the injuries to his lower extremities, he was "precluded from heavy work," and "precluded from running, jumping, climbing, frequent stair climbing, walking on rough ground and carrying heavy weights."  JVG0024-26.

As to the "cause" of the injury, Dr. Ascher stated: "Despite the particular, remembered injuries, which involve virtually the entire musculoskeletal system, this is a textbook picture of multiple stresses and strains and multiple traumata."  JVG0024.  Dr. Ascher also observed: "This man has had no injuries since he ceased playing football."  JVG0026.  Among the "reasons for [his] opinion," Dr. Ascher cited, JVG0026:

- "The duties of a professional football player."
- "The duration of time that [Mr. Giles] played professional football, from 1977 to 1989.  This is at least twice as long as the ordinary player stays with the game."
- "That this man's history indicates multiple and repeated traumatic incidents, of greater and lesser extent.  This follows the definition of cumulative trauma, with the whole resulting in the final disability which this man now has."
- "The duration of time that has elapsed since he ceased and desisted from playing professional football."
- "That there have been no intervening injuries."
- "That these conditions all became permanent and stationary at one and the same time, when he ceased and desisted from playing professional football."

As noted, Mr. Giles also submitted a report prepared by his personal physician, Dr. Adams.  See JVG0037-39.  Dr. Adams's report was dated November 16, 1995, roughly contemporaneous with the examination by Dr. Unger and the submission of the application to the Plan.  Dr. Adams gave a history of Mr. Giles's injuries and his then-current complaints, and

stated that Mr. Giles "lives the life of a semi-invalid due to his multiple injuries incurred in his long football career." JVG0037. He concluded: "In my professional opinion within reasonable bounds of medical probability, Mr. Giles is completely and totally disabled from multiple injuries incurred over his career in the National Football League." JVG0039.

Mr. Giles's 1995 application for T&P disability benefits was reviewed by the Plan's Retirement Board at its meeting of January 18, 1996. *See* JVG0054. The Retirement Board is composed of six voting members, three of whom are appointed by the NFL Players Association, and three of whom are appointed by the NFL Management Council. *See* Plan §§ 1.3, 8.1. The Plan vests the Retirement Board with "full and absolute discretion, authority and power to interpret, control, implement, and manage" the Plan and decide claims for benefits. Plan § 8.2. The Plan also states that the Retirement Board "will have the broadest discretion permissible under ERISA and any other applicable laws." Plan § 8.9. In particular, the Retirement Board is empowered to determine whether a player is "totally and permanently disabled" within the meaning of the Plan, *see* Plan §§ 5.1, 5.5(a), including the determination of whether a player is "substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit," so as to satisfy the General Standard for total and permanent disability. Plan § 5.2(a).

According to the minutes of its meeting of January 18, 1996, the Retirement Board referred Mr. Giles's application "to the Medical Advisory Physician in accordance with Plan section 8.3(a)." JVG0055. Under § 8.3(a), when the voting members of the Retirement Board are "deadlocked with respect to a decision as to . . . whether a claimant medically is substantially prevented from or substantially unable to engage in any occupation or employment for

remuneration or profit within the meaning of Section 5.2," the Retirement Board is empowered to refer the dispute, by the vote of three members, to the Plan's "Medical Advisory Physician" (sometimes referred to as the "MAP") for a "final and binding determination regarding such medical issues." Plan § 8.3(a). The MAP's determination of such a medical issue is final, although the Retirement Board otherwise retains its full interpretive authority. *Id.*

At the time, Dr. Alfred J. Tria, M.D., was the Plan's MAP. He conducted a physical examination of Mr. Giles on February 29, 1996, and prepared a report of the examination, *see* JVG0058, as well as a "Physician's Report" in the form prescribed by the Plan (*i.e.*, the same form as the "Physician's Report" that was completed by Dr. Unger). *See* JVG0062-63. In addition, he wrote a letter to the Director of the Plan, dated March 3, 1996. *See* JVG0060.

In his "Physician's Report," Dr. Tria opined that Mr. Giles was partially disabled as to his back, ankles, and knees, but that Mr. Giles was capable of engaging in "sedentary" employment. JVG0062. Dr. Tria answered in the affirmative the question asking if Mr. Giles's "injuries resulted from football related activity." JVG0062-63. In his cover letter, Dr. Tria stated: "Mr. Giles has had multiple joint injuries over his years of football." JVG0060. However, he concluded: "I do not believe that he has enough objective findings to warrant the total and permanent disability." *Id.*

On the basis of Dr. Tria's conclusions, the Retirement Board initially denied Mr. Giles's application for T&P disability benefits at its meeting of April 18, 1996. *See* JVG0068-69. The Plan permits an applicant to request further review by the Retirement Board of an initial denial of benefits, *see* Plan § 11.6, and Mr. Giles did so. *See* JVG0072. Mr. Giles's application was finally denied by the Retirement Board on October 10, 1996. *See* JVG0078-79. It ruled that Mr.

Giles was "not substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, and consequently does not satisfy the requirements of Plan sections 5.1 and 5.2." JVG0079.

C.  Subsequent Applications, Amendments to the Plan,
and Creation of the "Window Period"

Subsequently, Mr. Giles applied for and received early retirement benefits under the Plan. JVG0122,0137.  Thereafter, he sought to reapply for disability benefits from the Plan, but was precluded from doing so because he had accepted the retirement benefits.  JVG000154-160; 162-172.  Under the Plan, a player who is "receiving retirement benefits" is ordinarily ineligible for T&P disability benefits.  Plan § 5.1.[6]

In 2007 or 2008, the Plan was amended as a result of collective bargaining between the NFL Players Association and the NFL Management Council.  *See* Plan Motion at 3; Giles Motion at 5.[7]  Pursuant to the collective bargaining agreement, a new, alternative definition of "totally and permanently disabled" was added to the Plan.  In addition to the General Standard for T&P disability, which still applies, the Plan now provides an alternative standard, based on receipt of "Social Security Awards."  Plan § 5.2(b).  The Social Security Awards standard provides, *id.*:

> Effective April 1, 2007, a Player who has been determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or  Supplemental Security Income program,

---

[6] Mr. Giles challenged this denial in a judicial proceeding in the United States District Court for the Middle District of Florida.  That court granted summary judgment in favor of the Plan.  *See Giles v. Nat'l Football League Players Ass'n, et al.*, No. 8:01-Civ-2490-T-23MAP (M.D. Fla. Jan. 9, 2003) (JVG000154).

[7] The agreement that led to the amendments to the Plan is not contained in the record, but neither party disputes that the current provisions of the Plan reflect the agreed-upon amendments.

and who is still receiving such benefits at the time he applies, will be deemed to be totally and permanently disabled, unless four voting members of the Retirement Board determine that such Player is receiving such benefits fraudulently and is not totally and permanently disabled.

In addition, the 2007-08 amendments to the Plan established a "Window Period," between April 1 and July 31, 2008. During the Window Period, a player who had previously elected to receive early retirement benefits could apply for T&P disability benefits pursuant to the new Social Security Awards standard, notwithstanding the general provision barring applications for T&P disability benefits by players who were already receiving retirement benefits. *See* Plan § 5.8.[8]

### D. The 2008 Application for T&P Disability Benefits

On July 29, 2008, during the Window Period, Mr. Giles submitted a new application for T&P disability benefits. JVG000216-221. As noted, it is this application that is at issue.

Along with his Window Period application, Mr. Giles submitted a "Notice of Award" from the Social Security Administration ("SSA"), dated July 21, 2008, JVG000209-214, indicating that he was "entitled to monthly disability benefits beginning November 2006." The Notice of Award itself was silent as to the nature or cause of Mr. Giles's disability. *Id*. However, along with the Notice of Award, the SSA issued a "Disability Determination and Transmittal" (the "SSA Determination"), which indicated that plaintiff was disabled as of November 1, 2004, and listed a primary diagnosis of "Disorders of Back (Discogenic and

---

[8] A Window Period applicant could also qualify for T&P disability benefits under the General Standard. *See* Plan § 5.8(a), (b)(2). If a Window Period application was successful, the award of T&P disability benefit would be retroactive under certain circumstances, *see* Plan § 5.8(c), and would be reduced by the value of early retirement benefits already received for the same time period. *See* Plan § 5.8(f).

Degenerative)" and a secondary diagnosis of "Osteoarthrosis and Allied Disorders."[9]   As the "rationale" for the SSA's determination that Mr. Giles was disabled, the SSA Determination cited the SSA's Vocational Rule 201.14.   Under that rule, an individual is disabled if he or she is limited to sedentary work, is between 50 and 54 years old, and has prior education and skills that are not transferable to skilled, sedentary employment.[10]

Mr. Giles also submitted a "Physical Residual Capacity Assessment" (the "SSA Assessment"), which was prepared on June 2, 2008, by Dr. William Hand, M.D.  It consists of a form established by the SSA, and was part of Mr. Giles's application for Social Security disability benefits.  *See* JVG000198-205.  In the SSA Assessment, Dr. Hand noted that Mr. Giles weighed 383 pounds at the time of his examination.  JVG000199.  Further, Dr. Hand stated that Mr. Giles had "chronic cervical and lumbar pain" with "limited motion in the cervical and lumbar spine," and that his obesity "adversely affect[ed] the knee pain and the back pain."  *Id*. He assigned Mr. Giles a "primary diagnosis" of "Obesity" and a "secondary diagnosis" of "cervical and lumbar" impairments, along with osteoarthritis in both knees.   JVG000198. Moreover, he opined that Mr. Giles was limited to lifting no more than ten pounds and stated that Mr. Giles should be limited to standing for no more than a total of "one hour in an 8 hour day,"

---

[9] The SSA Determination was inadvertently omitted from the Administrative Record. Mr. Giles submitted it as Exhibit C to his motion.  *See* ECF 41-3.  The Plan agrees that the SSA Determination "should be considered by the Court in reviewing the Retirement Board's benefits determination."  Plan Reply at 8.

[10] The SSA's vocational rules, also known as "Medical-Vocational Guidelines," are set forth in 20 C.F.R. part 404, subpart P, appendix 2.  The Administrative Record also contains a "Vocational Analysis Worksheet" prepared in June 2008 by the SSA examiner who reviewed Mr. Giles's application for Social Security disability benefits, which supports the application of Vocational Rule 201.14.  *See* JVG000206-208.

noting that another physician's report that he had reviewed had indicated Mr. Giles could only stand for ten minutes at a time.  JVG000199-200.

Along with his Window Period application, Mr. Giles submitted a report by another physician, Dr. Darrell N. Blaylock, M.D., prepared on May 9, 2008, on the basis of a physical examination conducted on May 5, 2008.  *See* JVG000193-194.  Dr. Blaylock's report had been submitted to the SSA in support of Mr. Giles's application for Social Security disability benefits.[11]

Dr. Blaylock described Mr. Giles's history of football injuries and stated that Mr. Giles "felt that he had been disabled since 1990."  JVG000193.  Describing Mr. Giles as "morbidly obese," Dr. Blaylock noted that Mr. Giles weighed "in excess of 383 pounds" and indicated that his "current weight is apparently stable for the last four to five years."  JVG000193-194.  Dr. Blaylock iterated Mr. Giles's symptoms and range of motion and concluded: "In summary, this is a 53-year old man who apparently sustained multiple injuries while playing professional football. . . .  He is currently taking a large amount of pain medication.  I would suspect the only gainful employment he could be engaged in would be something where he sits for most of the time."  *Id.*

Finally, Mr. Giles submitted a report dated March 13, 2006, from Dr. Sardha Perera, M.D., a specialist in pain management.  JVG000189-192.  This report had also been submitted to the SSA in support of Mr. Giles's application for Social Security disability benefits.  See

---

[11] According to a later letter to the Plan from Mr. Giles's counsel, Dr. Blaylock acted as a "Consultative Examiner" in connection with Mr. Giles's Social Security disability benefits application, a role that plaintiff's counsel described as "pretty much the same as that of [a] neutral physician commonly used by the Plan."  JVG000240.

JVG000240. According to Dr. Perera, Mr. Giles's "chief complaint" was "[c]hronic persistent back pain, neck pain, upper and lower extremity radicular pain, bilateral knee pain, essentially 18 years in duration." JVG000189. Dr. Perera noted that plaintiff weighed 360 pounds, and recommended that plaintiff "go on an aggressive weight reduction regimen." JVG000191.

Mr. Giles's Window Period application for T&P disability benefits was initially referred to the Plan's Disability Initial Claims Committee (the "Committee").[12] By a letter dated September 8, 2008, the Plan's Benefits Coordinator, Paul Scott, informed Mr. Giles that the Committee had determined, in light of the "Notice of Award" from the SSA, that plaintiff qualified for T&P disability. JVG000227-000229. But, the Committee determined that Mr. Giles qualified only for the "Inactive" category of T&P benefits, rather than the "Football Degenerative" category, because the SSA's Notice of Award did not "indicate the basis for [Mr. Giles's] Social Security award, and the Committee determined that it had insufficient information to grant . . . a different category of T&P benefits." JVG000229.

By a letter to the Plan from Mr. Giles's counsel dated January 8, 2009, plaintiff appealed to the Retirement Board the classification of his disability as Inactive, rather than Football Degenerative. JVG 00239-000241. In the letter, Mr. Giles's counsel explained the basis of the application of Vocational Rule 201.14 by the SSA, noting that the rule entailed a determination

---

[12] Under the version of the Plan currently in effect, the Disability Initial Claims Committee, which consists of two members (one appointed by the NFL Players Association and the other by the NFL Management Council), is "responsible for deciding all initial claims for any and all disability benefits under [the] Plan." Plan § 8.5; *see also* Plan § 8.4 (composition of Committee). The Committee's decisions are subject to review by the Retirement Board. *See* Plan § 11.6(a). Because earlier versions of the Plan are not contained in the record, it is not clear whether the Committee existed at the time of Mr. Giles's earlier application for T&P disability benefits in 1995. However, as discussed, his earlier application was considered only by the Retirement Board; there is no indication in the record that it was reviewed by the Committee.

that Mr. Giles was limited to sedentary work.  His counsel stated: "It is important to note that this is the same conclusion reached by the Plan's medical advisory physician Alfred J. Tria, M.D. dated March 4, 1996.  In addition to finding that Mr. Giles was limited to sedentary work, MAP Tria felt that the injuries were from football related activity."  JVG000240 (emphasis omitted). Plaintiff's counsel also cited "a number of medical records which [Mr. Giles] had submitted in a previous claim for disability benefits through the Plan, including the report of George Adams, M.D. dated November 16, 1995; [and] David Ascher, M.D. dated February 25, 1991 . . . ."  *Id.* In sum, plaintiff's counsel argued, JVG000241:

> SSA has determined that Mr. Giles is disabled by virtue of his medically determinable impairments because he is not capable of performing any substantial gainful activity.  The medical records from his previous disability claim in 1996—which were found to be football related—are essentially the same as today, with the further degeneration expected by the passage of the additional years.
>
> Accordingly, Mr. Giles is totally disabled by virtue of his football related injuries within 15 years of his last credited season and should be found entitled to football degenerative total and permanent benefits.

The Retirement Board considered Mr. Giles's appeal at its February 12, 2009 meeting, *see* JVG000245-246, and decided to "table[ ]" the appeal to allow for "further medical review." JVG000246.  The Plan scheduled an "independent medical evaluation" of Mr. Giles by a "neutral physician," Dr. David Apple, M.D., which was to take place on March 10, 2009. JVG000247-248.  However, by a letter to the Plan from Mr. Giles's attorney dated March 2, 2009, plaintiff refused to attend the examination, arguing that it was unnecessary and inappropriate in light of his SSA disability benefits award.  JVG000250-51.

According to plaintiff's counsel, the examination was unnecessary because it was not needed to determine whether Mr. Giles's disability stemmed from football-related injuries.  His

counsel argued: "Determining football injury connection might possibly be an issue if it were not for the fact that the Plan's medical advisory physician found in 1996 that these impairments limited Mr. Giles to sedentary work (i.e. the same residual functional capacity as Social Security), and that they were in fact football related."   JVG000251.   Moreover, plaintiff's counsel claimed that evaluation by a neutral physician was inappropriate because, "under 2007 amendments to the Plan, the NFL [Players Association] and NFL jointly announced that Social Security Guidelines would be applied to NFL disability benefits.  In a White Paper issued by the NFLPA shortly thereafter, it was explained that 'because of this change . . . players already receiving Social Security benefits will not have to be examined by a Plan doctor.'"  *Id.* (quoting white paper).[13]  In closing, plaintiff's counsel stated: "Now that the Plan has eminent Orthopedist Steven [sic] Haas, M.D. as its Medical Director to help evaluate these cases there should be even less, if any, need to have additional examinations in cases such as Mr. Giles where the medical documentation is plentiful and covers many years."  *Id.*

Counsel for the Plan responded to plaintiff's counsel by letter dated March 16, 2009.  *See* JVG000252-253.  With respect to Mr. Giles's assertion that referral to a neutral physician was improper, the Plan cited an apparently unreported case involving another player, in which the Plan claimed that "the Court ruled that the Plan's referral of [the Player] to a neutral physician

---

[13] The "White Paper" issued by the NFL Players Association that plaintiff's counsel quoted is not contained in the Administrative Record.  However, plaintiff has submitted a copy of relevant excerpts from the White Paper as Appendix B to his motion.  *See* ECF 41-2. The Plan insists that "the Court should not consider [the White Paper] and should reject its proposed inclusion in the administrative record . . . ."  Plan Reply at 4 n.1.  Although I note that plaintiff's counsel's quotation of the White Paper was accurate, I need not resolve the controversy as to whether the White Paper is an appropriate subject of consideration in this case, because my ruling does not depend on the content of the White Paper.

was appropriate under circumstances very similar to those at issue here." JVG000252.[14]   The

Plan noted that Mr. Giles had cancelled the scheduled examination by a neutral physician and

asked plaintiff's counsel to advise whether Mr. Giles would reschedule the appointment.   *Id.*   "In

the meantime," however, the Plan's counsel stated that, "based on [plaintiff's counsel's]

suggestion, the Plan Office also is forwarding the file to the Plan's Medical Director for his

review."   *Id.*

        The position of "Medical Director" was established, effective as of April 1, 2008, by

Section 11.15 of the Plan, which authorizes the Retirement Board to designate "a board-certified

physician as the Plan's Medical Director."   Plan § 11.15(a).   The Medical Director's duties

include the provision of "medical advice with respect to the Plan's neutral physicians and

medical examination procedures."   Plan § 11.15(b).   The Plan states that the "Medical Director

will provide advice on medical issues relating to particular disability benefit claims as requested"

by members of the Retirement Board.   *Id.*   However, the Plan prohibits the Medical Director

from personally examining players, and states that the Medical Director "will not decide or

recommend whether a particular Player qualifies for a disability benefit."   *Id.*   Notably, the

position of Medical Director is distinct from the position of Medical Advisory Physician; as

---

[14] Notably, in the current edition of the Plan, which is dated April 1, 2009, § 5.2(c) states:

> A Player who is determined to be totally and permanently disabled
> because of an award of Social Security benefits . . . and who seeks benefits under
> Section 5.1(a), 5.1(b), or 5.1(c) [including benefits under the Football
> Degenerative category] may also be required to submit to an examination by a
> competent physician or physicians, or institution or institutions, selected by the
> Retirement Board . . . .   Any person refusing to submit to any physical
> examination will not be entitled to any total and permanent disability benefits
> under this Article.

However, as will be discussed, *infra*, the record does not make clear whether this
provision was available to plaintiff at the time he refused to be evaluated by a neutral physician.

noted, unlike the Medical Director, the MAP is authorized to determine "whether a claimant medically is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit" under the General Standard for T&P disability, if the Retirement Board is deadlocked as to a particular player's T&P disability benefits claim.  Plan § 8.3(a).

In any event, on March 30, 2009, the Plan referred the matter to its Medical Director, Stephen S. Haas, M.D.   In the referral, the Plan's Benefits Coordinator advised Dr. Haas: "In anticipation of a rescheduled neutral evaluation, the NFL [Players Association] and NFL [Management Council] have asked that you review the enclosed file and determine if there is sufficient evidence to support [a determination that] the Player's T&P disability is related to football."  JVG000255.

Dr. Haas provided his opinion in a letter dated April 8, 2009, stating, JVG000256:

I have reviewed the record of Mr. Giles.

It is my opinion that some of the conditions for which he has been determined to be disabled, are definitely related to football.   However, there is a significant element that is NOT football-related.

That is his weight.   The record shows that he weighed 230-240 pounds when he played.   His weight in 2008 was recorded as "over 383."

It is widely and unequivocally documented in the medical literature that obesity of this magnitude greatly exacerbates almost all medical conditions.   This is especially true for spine and lower extremity conditions.   Though many athletes may gain some weight after they discontinue formal training and conditioning programs, gains in excess of 150 pounds are far beyond even that seen in players who adopt a subsequent sedentary life style.

There have to be significant elements of behavior patterns and tendencies unrelated to football that conspire with the acknowledged disabilities in the record to produce the whole picture of Mr. Giles' unfortunate situation. . . .

- 19 -

His disability cannot reasonably be attributed totally to football.

The Plan's counsel forwarded Dr. Haas's opinion to plaintiff's counsel on April 22, 2009, and reiterated the Plan's insistence that Mr. Giles be evaluated by a neutral physician.  *See* JVG000257. The Plan's counsel stated: "Please be aware that if Mr. Giles chooses instead to continue to obstruct the appeal process, the Retirement Board will be forced to decide the matter on the basis of the current record or to deny the appeal for failure to comply with the Plan's appeal procedures." *Id.*  In response, plaintiff's counsel maintained, relying on the White Paper, that evaluation by a neutral physician was not appropriate.  *See* JVG000259-261.

The Retirement Board denied plaintiff's appeal at its meeting of May 13-14, 2009, JVG000265-66, based on plaintiff's failure to comply with the Plan's examination procedures. JVG 000267-000269.  By a letter to plaintiff's counsel dated May 28, 2009, the Retirement Board's decision was communicated to Mr. Giles.  *Id*.

Over six months later, on January 20, 2010, plaintiff's counsel wrote to the Plan's director.  *See* JVG000270.  He stated, *id.*:

> I am writing to ask if the Plan will send Mr. Giles for a neutral physician exam in connection with his claim for football degenerative benefits.  If so, Mr. Giles would be willing to attend such exam.
>
> I have just received a copy of the Plan amendments dated July 2, 2009, but effective retroactively to April 1, 2008, which indicate that the Plan still may require a retired player who has been granted Social Security Disability to submit to an examination.  (Sec. 5.2(c)).  All of these Plan amendments were not effectuated until after the Board's denial of Mr. Giles' claim, and as they are effective April 1, 2008, they apparently would apply in his case.
>
> As you know, this was contrary to the information upon which Mr. Giles and I previously based his refusal to attend.  The NFLPA White Paper in particular had stated that if a player was entitled to Social Security Disability benefits, they would not need to be examined by a Plan physician.

Please let us know of the Retirement Board's determination as soon as possible.

At its meeting of February 17-18, 2009, the Retirement Board agreed to "table[ ]" Mr. Giles's appeal "for further medical study."  The Plan referred Mr. Giles to a neutral physician, Dr. Glenn Perry, M.D., for an examination.  *See* JVG000276-277.

Dr. Perry examined Mr. Giles on April 7, 2010.  He prepared a report in a form similar to the form previously completed by Drs. Tria and Unger, as well as a narrative attachment.  In his report, Dr. Perry provided a medical history of plaintiff and the results of his physical examination, and concluded: "The orthopedic injuries described in themselves do not qualify the player for permanent and total disability.  However, the orthopedic conditions described did result from injuries sustained while playing football in the NFL."  JVG000281.

In light of Dr. Perry's evaluation, at its meeting of May 13, 2010, the Retirement Board again considered Mr. Giles's appeal.  JVG000287-000288.  By letter of May 18, 2010, the Board notified plaintiff that it affirmed the decision of the Plan's Disability Initial Claims Committee to award T&P benefits in the Inactive Category.  Noting that its decision was "[b]ased on the reports of Drs. Perry and Haas," the Board determined: "Mr. Giles has a combination of impairments, some related to NFL football and others not related to NFL football."  Further, it "concluded that, accounting solely for his NFL football impairments and excluding the non-NFL football impairments, Mr. Giles would not be totally and permanently disabled."  Therefore, it found that Mr. Giles was not entitled to Football Degenerative benefits, because "his total and permanent disability arises from other than League football activities."  JVG000291.

Plaintiff's counsel requested a copy of Dr. Perry's report, and the opportunity to submit comments upon it.  JVG00293.  Written comments were submitted to the Plan Director on June

1, 2010.  JVG000297-99.  But, in a letter dated August 31, 2010, the Plan's counsel informed plaintiff's counsel that, at its August 18, 2010 meeting, the Retirement Board elected not to reopen the matter.  JVG000303.  This suit followed.

Additional facts are included in the Discussion.

## Discussion

### A.  Standard of Review

As a participant in a plan covered by ERISA, plaintiff is entitled to bring an action "to recover benefits due to him under the terms of his plan."  ERISA § 502(a)(1)(B), 29 U.S.C. § 1132 (a)(1)(B).  When reviewing a denial of benefits under an ERISA-governed plan, a district court must first determine "whether the relevant plan documents confer discretionary authority on the plan administrator."  *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011).  When, as here, an ERISA plan vests its administrator or another particular fiduciary (in this case, the Retirement Board) with discretionary authority to construe the terms of the plan and determine eligibility for benefits, the plan's eligibility determination is subject to review only for abuse of discretion.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-15 (1989); *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010); *Boyd v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 796 F. Supp. 2d 682, 689 (D. Md. 2011).[15]

In reviewing a plan's determination under the deferential abuse of discretion standard, a court is limited to the evidence in the administrative record before the plan when the plan made

---

[15] Under Section 8.2 of the Plan, the Retirement Board is designated as the "'named fiduciary' of the Plan within the meaning of section 402(a)(2) of ERISA," and is granted the authority to interpret and construe the terms of the Plan.

the decision under review. *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995); *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.,* 32 F.3d 120, 125 (4th Cir. 1994); *Brodish v. Fed. Express Corp.,* 384 F.Supp.2d 827, 833 (D. Md. 2005) ("Generally, the Fourth Circuit defines the administrative record as those facts known to the administrator at the time the administrator made the benefits eligibility determination.").

In the ERISA context, the standard or review "equates to reasonableness: [A court] will not disturb an ERISA administrator's discretionary decision if it is reasonable." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008) (citations omitted). "At its immovable core," the standard requires that a court "not reverse merely because it would have come to a different result in the first instance." *Id.* Thus, for the Retirement Board's decision in this case to be upheld, it need only be "'the result of a deliberate, principled reasoning process and . . . supported by substantial evidence.'" *Id.* (quoting *Bernstein*, 70 F.3d at 788). However, "the abuse of discretion standard is less deferential to administrators than an arbitrary and capricious standard would be; to be unreasonable is not so extreme as to be irrational." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008).

In *Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000), the Fourth Circuit outlined eight factors to consider in evaluating the reasonableness of the benefit decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

A reviewing court may not overturn a benefit decision where it results from a "deliberate, principled reasoning process" and where it is supported by substantial evidence. *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995). Substantial evidence is such relevant and probative evidence that a reasonable mind would accept as adequate to support a particular conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619-20 (1966). The substantial evidence standard requires more than a mere scintilla, but less than a preponderance of the evidence. *See Richardson*, 402 U.S. at 401; *Consolo*, 383 U.S. at 620. It "does not mean a large or considerable amount of evidence[.]" *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988). The court does not reweigh the evidence. *Consolo*, 383 U.S. at 620.

Nevertheless, an ERISA plan "administrator's discretion never includes the authority 'to read out unambiguous provisions' contained in an ERISA plan." *Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 639 (4th Cir. 2007) (quoting *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005), *cert. denied*, 547 U.S. 1148 (2006)). Indeed, to ignore the plain language of the plan "constitutes an abuse of discretion." *Blackshear*, 509 F.3d at 639; *accord Day v. AT&T Disability Income Plan*, 685 F.3d 848, 853 (9th Cir. 2012) ("'ERISA plan administrators abuse their discretion if they . . . construe provisions of the plan in a way that conflicts with the plain language of the plan.'") (citation and some internal quotations marks omitted); *Edwards v. Briggs & Stratton Retirement Plan*, 639 F.3d 355, 362 (7th Cir. 2011) ("'[U]nambiguous terms of a[n] [ERISA] plan leave no room for the exercise of interpretive discretion by the plan's administrator.'") (citation omitted); *Admin. Cmte. of Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Gamboa*, 479 F.3d 538, 542 (8th Cir. 2007)

("An interpretation that conflicts with the plain language of a health and welfare plan is an abuse of discretion . . . .").

## B.  Preliminary Matters

Before reaching the heart of the parties' controversy, I will address two peripheral disputes.

First, plaintiff argues that the Plan's determination is suspect because the Plan "serves dual roles as . . . adjudicator of benefit claims and payor of benefits to retired players."  *Id.* at 18. He insists that "the Plan clearly disregarded its fiduciary duties to him and made a decision to serve [its] own interests."  *Id*.  Plaintiff acknowledges that the members of the Plan's Retirement Board are appointed in equal numbers by the NFL Players Association and the NFL Management Counsel.  However, he asserts that "[r]outine unanimous votes belie the notion of 'balance' among the Retirement Board members."  Giles Reply at 9.  Further, Giles argues that the Plan's counsel "is in a position to benefit financially when a player's claim is denied by the Retirement Board and it proceeds on appeal to the U.S. Courts, as is the case here."  *Id.* at 11.

Plaintiff's argument lacks merit.  To be sure, in *Metropolitan Life Insurance Co. v. Glenn*, *supra*, 554 U.S. 105, 108 (2008), the Supreme Court held that, where "the entity that administers [an ERISA] plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," the "dual role creates a conflict of interest," and "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." However, since *Glenn* several cases in this district have concluded uniformly that the NFL Plan's structure does not create the type of conflict of interest described in *Glenn*.  In a recent decision,

*Boyd v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 796 F. Supp. 2d 682, 690-91 (D.

Md. 2011), Judge J. Frederick Motz thoroughly reviewed the applicable case law, stating:

> Circuits who have considered the issue after *Glenn* are divided as to whether a conflict should be found where, as here, the entity acting as the administrator of the plan is made up equally of representatives of the employees, who receive benefits from the plan, and the employer, who funds the plan. . . . [*Compare*] *Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trs.*, 588 F.3d 641, 648 (9th Cir. 2009) [(holding that such a structure does not create a conflict)]; *Klein v. Cent. States, Se. & Sw. Areas Health & Welfare Plan*, 346 Fed. App'x 1, 5 (6th Cir. 2009) (unpublished) [(same)] . . . [*with*] *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138-39 (2d Cir. 2010) [(holding that this structure did pose a conflict, although the presence of employee representatives might mitigate the significance or severity of the conflict)].
>
>     In this District, two post-*Glenn* courts have held that the Board is not conflicted by virtue of its composition. *See, e.g.*, *Stewart v. Bert Bell/Pete Rozelle NFL Retirement Plan*, 1:09-cv-02612-WDQ (D. Md. Jan. 13, 2011); *Sagapolutele v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 1:08-cv-01870-WMN (D. Md. Oct. 22, 2008). I find the reasoning of these cases to be persuasive, and I too hold that the Board does not suffer from a conflict of interest.

Judge Motz also observed that, even if he were to conclude that the Plan labored under a

conflict of interest, "other structural protections provided by the Plan—for instance, the presence

of equal union representatives, the use of a trust rather than direct payments by the NFL, and the

Board's reliance on independent physicians in making benefit determinations—would drastically

diminish the significance of this factor in [his] analysis." *Boyd*, 796 F. Supp. 2d at 691 n.2. I

agree entirely with Judge Motz and the other judges in this district who have reached similar

conclusions, and hold that the Plan does not operate under a structural conflict of interest and, in

the alternative, that the effect of any such conflict would be strongly outweighed by other

structural protections of the Plan.

    Second, plaintiff argues that the Plan denied him the "full and fair review" guaranteed by

ERISA, 29 U.S.C. § 1133(2), by failing to provide him with a copy of Dr. Perry's report until

after the Retirement Board had already reached its final decision to deny him Football
Degenerative benefits.  This position also lacks support in the case law.  In *Skipp v. Hartford Life
Insurance Co.*, Civ. No. CCB-06-2199, 2008 WL 346107, at *9-10 (D. Md. Feb. 6, 2008), Judge
Catherine C. Blake observed that there was, at that time, a "split among the circuits as to this
issue": the Eighth Circuit had adopted the view that a plan administrator must permit a claimant
to review and comment on appeal-level physicians' opinions before rendering an opinion, *see
Abram v. Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005), but the Tenth Circuit took the position that
"[p]ermitting a claimant to receive and rebut medical opinion reports generated in the course of
an administrative appeal . . . would set up an unnecessary cycle of submission, review, re-
submission, and re-review."  *Metzger v. UNUM Life Ins. Co.*, 476 F.3d 1161, 1166 (10th Cir.
2007).  The Fourth Circuit has not addressed this issue in a reported opinion.

In *Skipp*, Judge Blake found the Tenth Circuit's approach more compelling, and
subsequent decisions in this district have followed Judge Blake's lead.  *See, e.g.*, *Clarke v. Unum
Life Ins. Co.*, 852 F. Supp. 2d 663, 676-77 (D. Md. 2012) ("This Court has adopted the position
of the Tenth Circuit . . . that an insurer does not have to provide a claimant with medical opinion
reports generated during the claims review process until a final decision is issued."); *Savoy v.
Fed. Exp. Corp. Long Term Disability Plan*, Civ. No. DKC-09-1254, 2010 WL 3038721, at *5
(D. Md. July 30, 2010).  Notably, since Judge Blake observed in *Skipp* the existence of a circuit
split, the split has been resolved: in *Midgett v. Washington Group Int'l Long Term Disability
Plan*, 561 F.3d 887, 896 (8th Cir. 2009), the Eighth Circuit held that its decision in *Abram* had
been overtaken by subsequent regulatory amendments and brought itself into alignment with
*Metzger*, ruling that "the full and fair review to which a claimant is entitled under 29 U.S.C.

- 27 -

§ 1133(2) does not include reviewing and rebutting, prior to a determination on appeal, the opinions of peer reviewers solicited on that same level of appeal." Accordingly, the Plan's failure to provide Dr. Perry's report to Mr. Giles before rendering its decision is of no moment.

### C. Football Degenerative Disability

As defendant puts it, "[t]he basic issue in this case is whether [Mr. Giles's] present inability to work 'arises out of' NFL football." Plan Motion at 1. In defendant's view, the Retirement Board's classification of Mr. Giles's disability as "Inactive" rather than "Football Degenerative" was a reasonable decision supported by substantial evidence in the Administrative Record, and sufficient to defend against challenge in light of the high level of deference to which the Retirement Board's decisions are entitled. Plan Motion at 12. According to the Plan, there was "no affirmative evidence in Mr. Giles' medical record demonstrating that his present orthopedic injuries arose from football." *Id.* Defendant also points to the evaluations of Dr. Haas and plaintiff's own physicians for evidence that it was plaintiff's obesity that was the cause of his T&P disability, not injuries sustained during his football career. *Id.* at 13. In the Plan's view, this conclusion was ratified by Dr. Perry, who, as defendant phrases it, "determined that Mr. Giles' football related orthopedic injuries by themselves did not cross the line and 'qualify the player [Mr. Giles] for permanent and total disability.'" *Id.* (quoting JVG000281) (alteration in Plan Motion).

Defendant notes that the terms of the Plan provide that a disability "does not arise out of NFL football activities if the Player 'would not qualify for benefits **but for** an injury (or injuries) or illness that arises out of other than League Football activities.'" Plan Reply at 1-2 (quoting Plan § 6.4(c)) (defendant's emphasis). In defendant's view, "[t]here is no medical evidence in

the administrative record supporting a determination that Mr. Giles' NFL-related injuries <u>alone</u> would make him unable to work."  Plan Reply at 2 (emphasis in original).  In support of this contention, it points to Dr. Perry's opinion that plaintiff's "disability cannot reasonably be attributed totally to football."  *Id.* (quoting JVG 000256).  Defendant also emphasizes that, as the Plan "is administered by a joint board appointed equally by the NFLPA and NFLMC," it is "protect[ed] against potentially biased claims determinations."  Plan Reply at 3.

Plaintiff counters that the Social Security Administration has found him to be totally and permanently disabled on the basis of his inability to perform other than sedentary work, in combination with the non-medical factors of his age, education, and training.  Moreover, he argues that, as early as 1995, Dr. Unger and Dr. Tria both found that he was limited to sedentary work because of his football-related injuries.  To be sure, that finding did not qualify Mr. Giles as totally and permanently disabled at the time, when the General Standard was the only standard for a finding of total and permanent disability under the Plan.  But, now that the Plan accepts a determination of disability pursuant to a Social Security Award, Mr. Giles insists that the evidence before the Plan dictates that his football-related injuries are the but-for cause of his limitation to sedentary work and his disability.  Plaintiff observes: "As the Plan has accepted a favorable Social Security determination as proof that a player is disabled, they must also accept the fact that a player—such as Giles, is deemed 'totally' disabled, notwithstanding an ability to perform full-time sedentary work."  *Id.*

Mr. Giles challenges the Plan's reliance on Dr. Perry's finding that plaintiff was not "T&P disabled," although his "orthopedic conditions…did result from injuries sustained while playing football."  JVG000281.   According to plaintiff that "the only relevant issue before" Dr.

Perry was whether plaintiff's impairments were football-related.  As to that issue, he reasons, Dr. Perry's "opinion is totally supportive of Giles' claim for football degenerative disability benefits."  Giles Motion at 12-13.  Mr. Giles posits that it is "completely understandable why Dr. Perry opined that Giles wasn't totally disabled as he was obviously unaware of the appropriate standard for his examination of Giles."  Giles Reply at 6-7.  Plaintiff suggests that the Plan must have "never communicated . . . to Dr. Perry" the "crucial change in eligibility criteria"—*i.e.*, that the Plan had agreed to accept the Social Security Administration's determination of disability. Giles Motion at 13.  In this respect, Mr. Giles notes that the Plan provided Dr. Perry with its standard Physician's Report form, which is largely unchanged from the version provided to Drs. Tria and Unger in connection with his 1995 application.  Notably, the form provided to Dr. Perry makes no mention of the possibility that a player might qualify as totally and permanently disabled pursuant to a Social Security award.   In plaintiff's view, the Plan should have "explained to Dr. Perry that [it] accepted the fact that Giles was disabled even though he was capable of sedentary work."  Giles Reply at 6.

According to plaintiff, "the only basis the Defendant has set forth that Giles is not entitled to 'Football Degenerative' disability benefits is that he is obese."  Giles Motion at 13.  Plaintiff concedes that he is obese, but insists that "Defendant's decision to hold that against him is arbitrary and capricious and unreasonable…"  *Id*.  Plaintiff observes that Drs. Unger, Tria, and Perry, all of whom are Plan physicians, failed to record or comment on plaintiff's weight, causing him to conclude "that obesity is not an issue or consideration in the disability examinations of former NFL players under the Plan."  Giles Motion at 15-16.  Plaintiff also observes that he "was medically obese when he played" professional football, a career for which

"[h]is size was an asset." *Id.* at 15.  He argues: "To use a physical attribute that contributed to his success as a football player—his size—against him is patently unreasonable." *Id.*

Further, plaintiff notes that "the Plan found that Giles was limited to sedentary work as a result of his football related orthopedic impairments in 1996," a determination that rendered him "T&P disabled" under the SSA definition, which the Plan has decided to accept, eight years later. *Id.*  In his view, "it is irrelevant that he had additional medical impairments, specifically obesity." *Id.*  He posits, *id.* at 13-14:

> [I]f a former NFL player is injured in a game and becomes a paraplegic; obviously he should be entitled to disability as a result of his football injuries.  If this same man subsequently develops additional medical conditions, such as diabetes; or suffers a heart attack or stroke, these impairments would obviously contribute to his overall disability—but they would be irrelevant to the fact that he became totally disabled as a result of a football injury.  It is unreasonable for the Plan to disqualify Giles due to additional medical impairments which may affect his overall health once he has shown that he qualifies as disabled based solely upon his orthopedic football injuries limiting him to sedentary work.

And, Giles argues: "The very name of the benefit which the plan provides—and Giles seeks— *football degenerative*; and the fact that the Plan allows players 15 years after their NFL retirement to qualify for this benefit; indicates that the Plan expects players' orthopedic impairments to worsen (i.e. *degenerate*) over time."  Giles Reply at 4.

Plaintiff also challenges the Board's reliance on Dr. Haas's findings.  Noting that Dr. Haas "never examined Giles," plaintiff maintains that "the Plan obviously felt that his opinion was insufficient to sustain a denial of benefits, as they subsequently wanted the opinion of an examining physician."  Giles Motion at 14.  Plaintiff also argues that the Plan explicitly prohibits the Medical Director from opining as to whether a particular player is eligible for T&P disability benefits.  *See*  Giles Motion at 14.

As I see it, the Plan's position that Mr. Giles's disability is not football-related suffers from two fatal defects.  First, the Plan's position disregards the Social Security Awards standard for total and permanent disability in the context of Football Degenerative benefits.  Second, the Plan's position relies primarily on the conclusions of its Medical Director, Dr. Haas.  Both defects contravene the plain language of the Plan and thus constitute an abuse of discretion.

With regard to the Retirement Board's misapprehension of the Social Security Awards standard, as noted, Giles submitted to examinations by both Dr. Unger and Dr. Tria at the direction of the Plan in connection with his 1995 application for T&P disability benefits.  Both doctors opined that Mr. Giles had substantial injuries and that those injuries limited him to sedentary work.  In addition, both Dr. Unger and Dr. Tria opined that Giles's injuries were caused by NFL football.  However, Giles did not qualify as totally and permanently disabled under the General Standard for T&P disability, which was the Plan's only definition of T&P disability at that time, because he was still able to perform work, albeit only sedentary work.

In particular, Dr. Tria specifically used the term "sedentary."  JVG0064.  Dr. Unger stated: "Patient may work as long as it does not require squatting, climbing, kneeling or lifting [more than] 60 [pounds]."  JVG0050.  Dr. Unger also stated: "[Giles] has not been doing any work since he stopped playing football. . . .  His major problem at this time is that he can't get up from his bed without having to sit for a while because of pain in both knees, his left ankle and his low back.  He cannot walk up or down stairs without holding on to the rails."  JVG0046.

Of import here, the Plan was later amended by contractual agreement to include the Social Security Awards standard as an additional method to demonstrate total and permanent disability.  It is undisputed that the Social Security Administration has determined that Mr. Giles

is totally disabled for purposes of Social Security benefits.  This is so, despite the fact that Mr. Giles is capable of performing sedentary work.  Under the applicable Social Security classification code assigned to Mr. Giles (Vocational Rule 201.14), a person is totally disabled if he is over 50 years of age, cannot perform his past relevant work, and does not have skills transferable to sedentary work.  Therefore, plaintiff has established that he is disabled under the Plan's Social Security Awards standard.

When Mr. Giles was evaluated in 2010 by Dr. Perry, at the Plan's direction, in connection with his 2008 application for benefits, Dr. Perry gave an opinion that was entirely consistent with the previous opinions of Dr. Unger and Dr. Tria, issued fifteen years earlier: "The orthopedic injuries in themselves do not qualify the player for permanent and total disability. However, the orthopedic conditions described did result from injuries sustained while playing football in the NFL."  JVG000281.  If the Plan's General Standard for total and permanent disability, Plan § 5.2(a), were still the only applicable standard, Mr. Giles would still be ineligible for T&P disability benefits.  But, as Dr. Unger and Dr. Tria had already concluded, the orthopedic injuries that Mr. Giles sustained as a result of NFL football were sufficient to render him unable to perform non-sedentary work.  And, under the SSA determination that the Plan is now contractually bound to accept, Mr. Giles's inability to perform other than sedentary work, due to his injuries, when combined with his age and lack of appropriate vocational skills, renders him totally and permanently disabled under the Social Security Awards standard provided by Plan § 5.2(b).  The only matter as to which Dr. Perry should have been asked to opine was whether Mr. Giles's established disability arose from League football activities.  The form of Dr. Perry's opinion, and the fact that it was provided in conjunction with the Plan's form Physician's

Report, suggests that Dr. Perry was not informed of the applicability of the Social Security Awards standard, by which Mr. Giles had been determined to be totally and permanently disabled due to his limitation to sedentary work, coupled with his age and training and experience.

Of course, the Plan agrees that Mr. Giles is totally and permanently disabled—it has awarded him T&P disability benefits, albeit at the Inactive level.  But, at the motions hearing, counsel for the Plan argued that a player must satisfy the General Standard for total and permanent disability, rather than the Social Security Awards standard, in order to qualify for the higher level of Football Degenerative benefits.  In my view, this interpretation lacks textual support in the Plan.  As I see it, the provisions of the Plan make clear that there are two alternative methods—the General Standard under Plan § 5.2(a) and the Social Security Awards standard under Plan § 5.2(b)—by which a player may demonstrate that he is totally and permanently disabled.  Once the player has done so, the method by which the player established his disability is irrelevant to the level of benefit to which he is entitled.  Rather, pursuant to Plan § 5.1, the level of benefits hinges on whether the player's established disability arose out of League football activities.  To the extent that the Retirement Board's decision was rendered on the basis of the interpretation offered by the Plan at the motions hearing, the Retirement Board abused its discretion by adopting a facially unsupportable interpretation of the Plan.

To be sure, the Plan maintains that Mr. Giles's disability does not "arise out of League football activities" so as to qualify for the Football Degenerative level of benefits.  Instead, defendant claims that Mr. Giles's disability arises, at least in part, from his obesity.  But, this claim is founded on the analysis of Dr. Haas, the Plan's Medical Director.  As plaintiff points

out, although the Medical Director is permitted to "provide advice on medical issues relating to particular disability benefit claims," the Medical Director may not "decide or recommend whether a particular Player qualifies for a disability benefit."  Plan § 11.15(b).  A determination on the basis of a medical issue is reserved to the Retirement Board or the Medical Advisory Physician.   Thus, the Retirement Board was prohibited by the plain terms of the Plan from relying on Dr. Haas's recommendation that Mr. Giles was ineligible for Football Degenerative benefits due to his obesity.[16]

Moreover, even if Mr. Giles's obesity is a contributing factor to his present impairments—and Mr. Giles concedes that it is—that fact alone would not preclude a determination that Mr. Giles's disability "arose out of League football activities" for purposes of the Football Degenerative benefit.  As noted, the Plan applies a "but for" standard to determine whether an injury is caused by football.  Under Section 6.4(c) of the Plan, "'Arising out of league football activities' does not include . . . a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than league football activities."  In other words, a disability to which both football injuries and non-football injuries contribute is not football-related only if the non-football injury is a but-for cause of the disability.  A non-football injury or condition that merely contributes to or aggravates an existing football injury, without being a but-for cause of disability, is not disqualifying.  Here, even if obesity has resulted in some further loss of function for Mr. Giles, both Dr. Unger and Dr. Tria opined that he was

---

[16] I recognize that it was plaintiff's counsel who initially requested that Dr. Haas review Mr. Giles's files.  But, the Plan has not suggested any principle that would permit it to disregard the plain language of the Plan at the request of a player.

already limited to sedentary work in 1995, purely as a result of his football injuries.[17]  Plaintiff's

limitation to sedentary work is the basis for his present finding of disability as determined by the

SSA.  Therefore, it would be difficult to conclude that obesity is a but-for cause of plaintiff's

disability.  Indeed, even Dr. Haas opined that "some of the conditions for which [Mr. Giles] has

been determined to be disabled, are definitely related to football."  JVG000256.

In support of its position, the Plan cites *Boyd v. Bert Bell/Pete Rozelle NFL Players*

*Retirement Plan*, 410 F.3d 1173 (9th Cir. 2005), in which the Retirement Board's determination

to award Inactive rather than Football Degenerative benefits was upheld.  But, *Boyd* is not

analogous to this case.

In *Boyd*, the player claimed that he was disabled due to "alleged organic brain problems

as the result of an alleged head trauma."  *Id.* at 1175.  The player claimed that his disability

stemmed from several hits to the head he had sustained during his football career, and submitted

medical opinions (including the reports of some neutral physicians selected by the Plan) that

were consistent with that claim.  However, the player was examined by another neutral physician

selected by the Plan, Dr. Gordon, who opined that his football injuries "'could not be responsible

for all or even a major portion of the neurologic and/or neuropsychologic problems that Mr.

Boyd is experiencing now.'"  *Id.* at 1177 (quoting physician's report).

---

[17] None of the physicians who examined Mr. Giles in 1995 and 1996 made note of his weight.  But, in 1991, Dr. Ascher stated that Mr. Giles weighed 289 pounds, only fifty pounds more than his playing weight.  In Dr. Ascher's view at that time, Mr. Giles was already "disabled" by his football injuries, such that he was "precluded from heavy work" and "precluded from running, jumping, climbing, frequent stair climbing, walking on rough ground and carrying heavy weights."  JVG0024-26.

The *Boyd* Court held that the Retirement Board did not abuse its discretion in relying on Dr. Gordon's opinion, rather than those of the other physicians.  The Ninth Circuit stated that an "ERISA administrator's exercise of its discretion to adjudicate claims is not a mere exercise in expert poll-taking," and that "a mere tally of experts is insufficient to demonstrate that an ERISA fiduciary has abused its discretion, for even a single persuasive medical opinion may constitute substantial evidence upon which a plan administrator may rely in adjudicating a claim."  *Id.* at 1179.  Moreover, the court observed that "the cause of Boyd's disability [was] far from clear." *Id.*  Even the medical reports that supported the player's claim were equivocal: those physicians had remarked that the player's impairments were "consistent with" or "may" have arisen from football head injuries, but had not opined definitively that they did so.  *Id.*

Here, it is undisputed that plaintiff has significant impairments resulting from his football injuries.  And, as noted, the only physician affiliated with the Plan who contended that obesity played any role in Mr. Giles's disability was Dr. Haas, who is not permitted to recommend a decision as to whether a player qualifies for a particular disability benefit.  It appears that the Plan simply wishes to apply the interpretation that its counsel advanced at oral argument: that a player may become eligible for Inactive benefits via the Social Security Awards standard for total and permanent disability, but must satisfy the General Standard of total inability to work in order to qualify for Football Degenerative benefits.  That interpretation contradicts the plain language of the Plan.  *See Blackshear*, *supra*, 509 F.3d at 639.

Nevertheless, it is not clear whether the Retirement Board actually considered, in connection with Mr. Giles's 2008 application, the medical reports that had been submitted with and/or prepared pursuant to his 1995 application.  What is clear is that plaintiff's counsel

expressly directed the Retirement Board's attention to those reports in the letter by which he presented Mr. Giles's appeal to the Board.  However, copies of the reports were not actually attached to the counsel's letter.  Many documents in the Administrative Record, including the medical reports, contain one or more date stamps.  At the motions hearing, counsel informed the Court that the date stamps indicate dates on which each document was reviewed by the Retirement Board.  But, the medical reports from the 1995 application do not contain date stamps later than 1996.  As a result, it is not clear that the Retirement Board reviewed the reports in connection with the 2008 application.

A district court has discretion to remand an ERISA dispute to a plan claims administrator for redetermination under a proper standard.  *See Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 362-63 (4th Cir. 2008); *see also Smith v. Continental Cas. Co.*, 369 F.3d 412, 421 (4th Cir. 2004) ("If the district court concludes that Continental Casualty failed to consider this Plan language, it can remand the case to Continental Casualty for further administrative review."); *Evans v. Metropolitan Life Ins. Co.*, 358 F.3d 307, 312 (4th Cir. 2004) ("Because MetLife abused its discretion . . . , we vacate the judgment of the district court and direct the district court to remand this case for further administrative review by MetLife consistent with this opinion."). To be sure, "'remand should be used sparingly.'"  *Champion*, 550 F.3d at 362 (quoting *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 609 (4th Cir. 1999)).  However, remand is appropriate when a case involves "complex medical issues crucial to the interpretation and application of plan terms," *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993).  Moreover, if a court "believes the [plan] administrator lacked adequate evidence on which to base a decision, 'the proper course [is] to remand to the [administrator] for a new determination, not to

bring additional evidence before the district court.'" *Elliott*, 190 F.3d at 609 (quoting *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1007 (4th Cir. 1985)).  Here, as noted, it is not clear that the Retirement Board considered Mr. Giles's medical reports from his 1995 application.

When a court directs a remand to a plan fiduciary, the court retains jurisdiction to consider a later challenge by either party to the determination on remand.  *See Dickens v. Aetna Life Ins. Co.*, 677 F.3d 228, 234 (4th Cir. 2012).  Thus, a remand "'allow[s] either party to challenge the ensuing eligibility determination by motion before the same court,'" *id.* (quoting *Bowers v. Sheet Metal Workers' Nat'l Pension Fund*, 365 F.3d 535, 537 (6th Cir. 2004)), and "preserves for appeal the claims administrator's challenges to the remand order and to 'any final judgment entered by the district court following the . . . decision on remand.'"  *Dickens*, 677 F.3d at 234 (quoting *Young v. Prudential Ins. Co. of Am.*, 671 F.3d 1213, 1216 (11th Cir. 2012)).  In this case, a remand will ensure that the Retirement Board considers all of the evidence properly before it, including the physicians' reports from the 1995 application, and renders its decision on the basis of a legally sound interpretation of the Plan's provisions.

Accordingly, in the Order that follows, I will remand this matter to the Retirement Board for reconsideration in light of this Memorandum Opinion.  Both parties' motions will be denied, without prejudice to the submission of new motions following the Retirement Board's determination on remand.


Date:   November 20, 2012                  _____/s/_____
                                          Ellen Lipton Hollander
                                          United States District Judge