IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JIMMIE V. GILES,

*Plaintiff*,

v.

BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN,

*Defendant*.

Civil Action No. ELH-12-634

## MEMORANDUM OPINION

This Court must resolve cross-motions for summary judgment in a dispute concerning disability benefits sought by Jimmie Giles, a retired National Football League player, from the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Plan"), an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), codified as amended at 29 U.S.C. §§ 1001 *et seq*. Through the Plan, Giles receives Total and Permanent ("T&P") disability benefits at the "Inactive" level. However, he claims that he should be classified in the "Football Degenerative" category, which would provide him with greater monthly benefits. Therefore, Giles seeks judicial review of the Plan's decision to award benefits to him at the lower level. *See* Complaint (ECF 1).

The cross-motions have been fully briefed, *see* ECF 63, 65,[1] and no hearing is necessary to resolve them. *See* Local Rule 105.6. For the reasons that follow, I will grant plaintiff's motion for summary judgment.

---

[1] In particular, I reviewed plaintiff's Motion for Summary Judgment Subsequent to Remand (ECF 63, "Giles Motion") and his supporting memorandum (ECF 63-1, "Giles Mem."); the Plan's Renewed Motion for Summary Judgment (ECF 65) and its supporting memorandum

## I. Background and Factual Summary

### A. Background

The parties filed earlier cross-motions for summary judgment (ECF 40, 41), which were argued in open court. In a Memorandum Opinion of November 20, 2012, I denied both motions and remanded the matter to the Plan's Retirement Board for reconsideration. *See* ECF 49 (Memorandum Opinion) and ECF 50 (Order), *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700 (D. Md. 2012) ("*Giles I*"). In a decision of March 27, 2013, the Retirement Board affirmed its denial of Football Degenerative benefits. Thereafter, plaintiff filed a request to reopen this case, ECF 52, which I granted. ECF 53.[2]

The underlying facts are fully recounted in *Giles I. See* ECF 49 at 2-22. As a result, I need not restate them here in their entirety.[3]

---

(ECF 65-1, "Plan Mem."); plaintiff's reply (ECF 66, "Giles Reply"); and the Plan's reply (ECF 67, "Plan Reply").

[2] When a court directs a remand to a plan fiduciary, the court retains jurisdiction to consider a later challenge by either party to the determination on remand. *See Dickens v. Aetna Life Ins. Co.*, 677 F.3d 228, 234 (4th Cir. 2012). Thus, a remand "'allow[s] either party to challenge the ensuing eligibility determination by motion before the same court,'" *id.* (quoting *Bowers v. Sheet Metal Workers' Nat'l Pension Fund*, 365 F.3d 535, 537 (6th Cir. 2004)), and "preserves for appeal the claims administrator's challenges to the remand order and to 'any final judgment entered by the district court following the . . . decision on remand.'" *Dickens*, 677 F.3d at 234 (quoting *Young v. Prudential Ins. Co. of Am.*, 671 F.3d 1213, 1216 (11th Cir. 2012)). Accordingly, I granted Giles's request to reopen. ECF 53.

[3] I incorporate here by reference the facts set forth in ECF 49. Unless otherwise noted, the facts are undisputed; they are drawn primarily from the Administrative Record. Following remand, the Administrative Record was supplemented to include additional materials, labeled JVG000393-775, submitted under seal. *See* ECF 57, 59, 64. The documents contained in the Administrative Record have been consecutively paginated with Bates numbering using the prefix "JVG." For clarity, I have cited to the record by Bates page number.

Giles was born in 1954. His NFL career included association with four franchises and spanned thirteen seasons, from 1977 until 1989. During that time, Giles generally weighed between 230 and 240 pounds.

The Plan was established pursuant to collective bargaining agreements between the NFL Players Association and the NFL Management Council to provide retirement, disability, and related benefits to eligible former professional football players and their beneficiaries. Giles first sought T&P disability benefits from the Plan in December 1995. Although that application was denied, Giles subsequently obtained early retirement benefits. On a later occasion, Giles again sought T&P disability benefits, but his application was denied because his receipt of early retirement benefits precluded his later application for T&P disability benefits. However, the Plan was subsequently amended to remove that limitation. Accordingly, in 2008 Giles filed another application for T&P disability benefits. It is that application which is at issue here. Ultimately, the 2008 application was granted, but at a lower level of benefits than that to which Giles contends he is entitled.

### B. The Plan's Provisions for T&P Disability Benefits

The Plan's T&P disability benefits are governed by Article 5.[4] Pursuant to Plan § 5.1, a player is entitled to a monthly T&P benefit if he is otherwise eligible and is determined to be "totally and permanently disabled as defined in section 5.2" of the Plan. In 1995, when Giles

---

[4] The Plan is governed by a comprehensive document that is also referred to as the "Plan." *See* JVG000319 *et seq.* The only version of the Plan that is contained in the record is dated April 1, 2009, *i.e.*, after the filing of Giles's first application for T&P disability benefits in 1995 and after the filing in 2008 of the application at issue. Aside from the particular differences that will be discussed, *infra*, the provisions of the Plan relevant to T&P disability benefits apparently have not changed materially since Giles's first application.

applied for T&P disability benefits, a player was considered "totally and permanently disabled" under the Plan only if he had "become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit," with some further qualifications that are not applicable here. Plan § 5.2(a). In the current version of the Plan, that standard is called the "General Standard." In 1995, the General Standard provided the sole definition of "totally and permanently disabled."

Effective April 1, 2007, the Plan was amended as a result of collective bargaining between the NFL Players Association and the NFL Management Council. *See* Plan Mem. at 3; Giles Mem. at 5. Pursuant to the collective bargaining agreement, an alternative definition of "totally and permanently disabled" was added to the Plan, based on receipt of "Social Security Awards." Plan § 5.2(b). The Social Security Awards standard provides, *id.*:

> Effective April 1, 2007, a Player who has been determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplemental Security Income program, and who is still receiving such benefits at the time he applies, will be deemed to be totally and permanently disabled, unless four voting members of the Retirement Board determine that such Player is receiving such benefits fraudulently and is not totally and permanently disabled.

Once a player is found to be totally and permanently disabled, regardless of the standard, the amount of the T&P disability benefit depends on the applicability of a particular benefits category: "Active Football," "Active Nonfootball," "Football Degenerative," or "Inactive." The latter two categories, "Football Degenerative" and "Inactive," are at issue in this case.

The "Football Degenerative" category applies "if the disability(ies) arises out of League football activities, and results in total and permanent disability before fifteen years after the end of the Player's last Credited Season." Plan § 5.1(c). In contrast, the Inactive category, which

entails a lower monthly benefit, applies "if (1) the total and permanent disability arises from other than league football activities while the Player is a Vested Inactive Player, or (2) the disability(ies) arises out of League football activities and results in total and permanent disability fifteen or more years after the end of the Player's last Credited Season."  Plan § 5.1(d).

The parties do not dispute that plaintiff's disability arose within fifteen years after his last credited season.  Nor do they dispute that Giles is totally and permanently disabled.  Rather, the dispute concerns Giles's classification.  The issue as to Giles's category turns on whether his disability "arises out of League football activities," so as to qualify him for the Football Degenerative category of benefits.  Plan § 5.1(c).

Article 5 of the Plan does not include a definition of "arises out of League football activities."  However, Plan § 6.4(c), relating to the "Line-of-Duty Disability" benefit, contains the following definition:

> "Arising out of League football activities" means a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities.  "Arising out of League football activities" does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities.

Both sides have agreed that the definition in Plan § 6.4(c) applies here.  *See Giles I*, ECF 49 at 5.  Moreover, in cases concerning T&P disability benefits, the definition taken from the "Line-of-Duty" section of the Plan has been applied by other courts.  *See, e.g.*, *Washington v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 504 F.3d 818, 821 n.4 (9th Cir. 2007); *see also Johnson v. American United Life Ins. Co.*, 716 F.3d 813, 821 (4th Cir. 2013) ("[A]mbiguous language in

one portion of an ERISA plan may well be clarified by reference to unambiguous language in another portion of the plan.").

## C. The 1995 Application and Subsequent Plan Amendments

As noted, Giles initially applied for T&P disability benefits in December 1995. As part of the application process, Giles was examined in November 1995 by Hugh Unger, M.D., F.A.C.S., who was selected by the Plan to conduct the examination. *See* JVG0034, JVG0045-50. In his report and in an accompanying letter to the Plan, Dr. Unger recounted Giles's lengthy history of injuries sustained while playing football and opined that Giles had a disability with respect to his back, ankles, and knees. JVG0045-50. Although Dr. Unger concluded that Giles's disability was the result of injury sustained in football-related activity, JVG0050, he opined that Giles was "employable," and was not "totally disabled to the extent that he is substantially unable to engage in any occupation for any remuneration or profit." JVG0049. Dr. Unger stated: "I find no contraindication with the patient performing an occupation that precludes squatting, kneeling, climbing and lifting over 60 [pounds]." JVG0048.

In addition to Dr. Unger's report, Giles included with his application the reports of two other physicians, David Ascher and George Adams. Dr. Ascher conducted Giles's NFL end-of-career examination for purposes of disability evaluation. *See* JVG0043. Dr. Adams served as Giles's personal treating physician during the off-seasons from 1986 until Giles's retirement from football in 1989, and on a regular basis thereafter. *Id.*

Dr. Ascher's report was prepared on February 25, 1991, on the basis of a physical examination of the same date, conducted within two years of Giles's retirement. *See* JVG0019-26. At that time, Giles weighed 289 pounds. *See* JVG0023. Dr. Ascher recounted a detailed

history of Giles's football injuries, *see* JVG0019-21, and also provided the following summary

of his injury history with the various teams for which Giles had played, JVG0021:

Houston:     Injury to right ankle.

Tampa Bay:   Falling on shoulders at various times with injury to both.  Injury to
             back when struck by another playing.
             Injury to left knee, 10th or 11th game, 1983.
             Injury to right knee, early in 1984 season.
             Tear of left quadriceps.
             Injury to neck, sternum, chest and left shoulder.  Missed one game
             following this injury.
             Developed bunions on both feet.
             Dislocated right ring finger in a game in Hawaii.
             Was knocked unconscious at least three times.

Detroit:     All symptoms became worse due to artificial turf and cold weather.

Philadelphia:  Bunions.  Neck and shoulder injury.  Injury to left ankle.

Dr. Ascher described Giles's "present complaints" as including chronic pain and stiffness

in his neck, shoulders, back, knees, and ankles.  He stated, in part, JVG0022:

[Giles's] low back is constantly painful. . . . He cannot sit for longer than an hour
without stretching his legs out in front of him.  Riding in a plane is extremely
painful for his back and his knees.  When he drives he must stop every hour or so
in order to rest his back.  He is able to walk for about a mile, by which time his
back will become painful.

                              *     *     *

Both knees are extremely painful.   There is audible crepitation with any
movement.  His knees constantly feel tired.  In February or March of 1990 his
right knee gave way on him while he was walking.  After any degree of prolonged
sitting both knees become excruciatingly painful.  He can no longer jog nor run
because of his knees. . . .  He cannot go up or down stairs without holding on to
the railing.

        At home he is able to do very little.  He does no yard work.  He can take
the trash out.  He can hit a baseball to his kids and he even coaches Little League,
but he cannot participate physically to any degree. . . .

On the basis of his findings, Dr. Ascher opined that Giles had a "permanent and stationary" disability. JVG0024. Although Dr. Ascher indicated that Giles was "looking for work," he noted that Giles was "no longer able to play professional football." *Id.* According to Dr. Ascher, Giles was "a qualified injured worker": due to the injuries to his lower extremities, he was "precluded from heavy work" and "precluded from running, jumping, climbing, frequent stair climbing, walking on rough ground and carrying heavy weights." JVG0024-26.

As to the "cause" of the injury, Dr. Ascher stated: "Despite the particular, remembered injuries, which involve virtually the entire musculoskeletal system, this is a textbook picture of multiple stresses and strains and multiple traumata." JVG0024. Dr. Ascher also observed: "This man has had no injuries since he ceased playing football." JVG0026. Among the "reasons for [his] opinion," Dr. Ascher cited, *id.*:

- "The duties of a professional football player."
- "The duration of time that [Giles] played professional football, from 1977 to 1989. This is at least twice as long as the ordinary player stays with the game."
- "That this man's history indicates multiple and repeated traumatic incidents, of greater and lesser extent. This follows the definition of cumulative trauma, with the whole resulting in the final disability which this man now has."
- "The duration of time that has elapsed since he ceased and desisted from playing professional football."
- "That there have been no intervening injuries."
- "That these conditions all became permanent and stationary at one and the same time, when he ceased and desisted from playing professional football."

Dr. Adams's report, dated November 16, 1995, was roughly contemporaneous with the examination performed by Dr. Unger. *See* JVG0037-39. Dr. Adams recounted Giles's history of injuries and his then-current complaints, and observed that Giles "lives the life of a semi-invalid due to his multiple injuries incurred in his long football career." JVG0037. He concluded: "In

my professional opinion within reasonable bounds of medical probability, Mr. Giles is completely and totally disabled from multiple injuries incurred over his career in the National Football League." JVG0039.

Giles's 1995 application for T&P disability benefits was reviewed by the Plan's Retirement Board at its meeting of January 18, 1996. See JVG0054. The Retirement Board is composed of six voting members, three of whom are appointed by the NFL Players Association, and three of whom are appointed by the NFL Management Council. See Plan §§ 1.3, 8.1. The Plan vests the Retirement Board with "full and absolute discretion, authority and power to interpret, control, implement, and manage" the Plan and decide claims for benefits. Plan § 8.2. The Plan also states that the Retirement Board "will have the broadest discretion permissible under ERISA and any other applicable laws." Plan § 8.9.[5]

According to the Retirement Board's minutes of its meeting of January 18, 1996, Giles's application was referred "to the Medical Advisory Physician ['MAP'] in accordance with Plan section 8.3(a)." JVG0055. The MAP's determination of such a medical issue is final, although the Retirement Board otherwise retains its full interpretive authority. Plan § 8.3.

Alfred J. Tria, M.D., the Plan's MAP, examined Giles on February 29, 1996. He prepared a report of the examination, *see* JVG0058, as well as a "Physician's Report" in the form prescribed by the Plan (*i.e.*, the same form as the "Physician's Report" that was completed by Dr. Unger). *See* JVG0062-63. In addition, he wrote a letter to the Director of the Plan, dated March 3, 1996. *See* JVG0060.

---

[5] Because the Retirement Board acts on behalf of the Plan, I have sometimes used the terms interchangeably.

In his "Physician's Report," Dr. Tria opined that Giles was partially disabled as to his back, ankles, and knees, but that Giles was capable of engaging in "sedentary" employment. JVG0062. In response to a question asking if Giles's "injuries resulted from football related activity," Dr. Tria answered in the affirmative. JVG0062-63. In his cover letter, Dr. Tria stated: "Mr. Giles has had multiple joint injuries over his years of football." JVG0060. However, he concluded: "I do not believe that he has enough objective findings to warrant the total and permanent disability." *Id.*

Thereafter, at its meeting of April 18, 1996, the Retirement Board denied Giles's application for T&P disability benefits. *See* JVG0068-69. After a further review completed at Giles's request, the Retirement Board again denied the application on October 10, 1996. *See* JVG0078-79. In so ruling, the Board stated that Giles was "not substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, and consequently does not satisfy the requirements of Plan sections 5.1 and 5.2." JVG0079.

Subsequently, Giles applied for and received early retirement benefits under the Plan. JVG0122, JVG0137. At that time, acceptance of the retirement benefits rendered Giles ineligible for T&P benefits. Plan § 5.1 (indicating that a player who is "receiving retirement benefits" is ordinarily ineligible for T&P disability benefits).

As indicated, the Plan was subsequently amended to provide for an alternative method to qualify as "totally and permanently disabled," based on receipt of Social Security Awards. Plan § 5.2. In addition, the amendments to the Plan established a "Window Period," between April 1 and July 31, 2008, in which a player who had previously elected to receive early retirement benefits could apply for T&P disability benefits pursuant to the new Social Security Awards

standard, notwithstanding the general provision barring applications for T&P disability benefits by players receiving retirement benefits.  *See* Plan § 5.8.[6]

## D.  Giles's 2008 Application for T&P Disability Benefits

On July 29, 2008, during the Window Period, Giles submitted a new application for T&P disability benefits under the Plan.  JVG000216-21.  As noted, it is this application that is in issue.

Among other materials submitted with his Window Period application, Giles provided a "Notice of Award" from the Social Security Administration ("SSA"), dated July 21, 2008, JVG000209-14, indicating that he was "entitled to monthly disability benefits beginning November 2006."  The SSA's Notice of Award was silent as to the nature or cause of Giles's disability.  *Id.*  However, along with the Notice of Award, the SSA issued a "Disability Determination and Transmittal," which indicated that plaintiff was disabled as of November 1, 2004, and listed a primary diagnosis of "Disorders of Back (Discogenic and Degenerative)" and a secondary diagnosis of "Osteoarthrosis and Allied Disorders."  JVG000729.  As the "rationale" for the SSA's determination that Giles was disabled, the "Disability Determination and Transmittal" cited the SSA's Vocational Rule 201.14.  *Id.*  Under that rule, an individual is deemed disabled if he or she is limited to sedentary work, is between 50 and 54 years old, and has prior education and skills that are not transferable to skilled, sedentary employment.[7]

---

[6] A Window Period applicant could also qualify for T&P disability benefits under the General Standard.  *See* Plan § 5.8(a), (b)(2).  If a Window Period application was successful, the award of T&P disability benefit would be retroactive under certain circumstances, *see* Plan § 5.8(c), and would be reduced by the value of early retirement benefits already received for the same time period.  *See* Plan § 5.8(f).

[7] The SSA's vocational rules, also known as "Medical-Vocational Guidelines," are set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 2.  The Administrative Record also contains a "Vocational Analysis Worksheet" prepared in June 2008 by the SSA examiner who reviewed

Giles also submitted a "Physical Residual Capacity Assessment" (the "SSA Assessment"), prepared by William Hand, M.D. on June 2, 2008. *See* JVG000198-205. In the SSA Assessment, Dr. Hand assigned Giles a "primary diagnosis" of "Obesity" and a "secondary diagnosis" of "cervical and lumbar" impairments, along with osteoarthritis in both knees. JVG000198. Dr. Hand noted that Giles weighed 383 pounds at the time of his examination. JVG000199. Further, he stated that Giles had "chronic cervical and lumbar pain" with "limited motion in the cervical and lumbar spine," and that his obesity "adversely affect[ed] the knee pain and the back pain." *Id.* Moreover, Dr. Hand found that Giles was limited to lifting no more than ten pounds and stated that Giles should be limited to standing for no more than a total of "one hour in an 8 hour day," noting that another physician's report that he had reviewed had indicated Giles could only stand for ten minutes at a time. JVG000199-200.

In support of his Window Period application, Giles also included a report that he had submitted in connection with his application for Social Security disability benefits. It was the report of Darrell N. Blaylock, M.D., dated May 9, 2008, based on a physical examination conducted on May 5, 2008. *See* JVG000193-94.

Dr. Blaylock described Giles's history of football injuries and stated that Giles "felt that he had been disabled since 1990." JVG000193. Describing Giles as "morbidly obese," Dr. Blaylock observed that Giles weighed "in excess of 383 pounds" and indicated that his "current weight is apparently stable for the last four to five years." JVG000193-94. Dr. Blaylock iterated Giles's symptoms and range of motion, concluding: "In summary, this is a 53-year old man who apparently sustained multiple injuries while playing professional football. . . . He is currently

Giles's application for Social Security disability benefits, which supports the application of Vocational Rule 201.14. *See* JVG000206-08.

- 12 -

taking a large amount of pain medication.  I would suspect the only gainful employment he could be engaged in would be something where he sits for most of the time."  *Id.*

Finally, Giles submitted a report from Sardha Perera, M.D., a specialist in pain management, dated March 13, 2006.  JVG000189-92.  This report was also submitted to the SSA in support of Giles's application for Social Security disability benefits.  *See* JVG000240.  According to Dr. Perera, Giles's "chief complaint" was "[c]hronic persistent back pain, neck pain, upper and lower extremity radicular pain, bilateral knee pain, essentially 18 years in duration."  JVG000189.  Dr. Perera noted that plaintiff weighed 360 pounds, and recommended that plaintiff "go on an aggressive weight reduction regimen."  JVG000191.

Giles's Window Period application for T&P disability benefits was initially referred to the Plan's Disability Initial Claims Committee (the "Committee").  By letter dated September 8, 2008, the Plan's Benefits Coordinator, Paul Scott, informed Giles that the Committee had determined, in light of the "Notice of Award" from the SSA, that plaintiff qualified for T&P disability.  JVG000227-29.  But, the Committee determined that Giles qualified only for the Inactive category of T&P benefits, rather than the Football Degenerative category, because the SSA's Notice of Award did not "indicate the basis for [Giles's] Social Security award, and the Committee determined that it had insufficient information to grant . . . a different category of T&P benefits."  JVG000229.

Giles's counsel sent a letter to Sarah Gaunt, the Plan Director, dated January 8, 2009, appealing the classification of Giles's disability at the Inactive level, rather than as Football Degenerative.  JVG000239-41.  In the letter, plaintiff's counsel explained the SSA's Vocational

Rule 201.14, noting that Giles was found to be disabled based on his "age (over 50), his education and residual functional capacity limited to sedentary work." *See* JVG000240-41.

The Retirement Board considered Giles's appeal at its meeting on February 12, 2009, but deferred judgment pending "further medical review." JVG000245-46. Months of discussion followed, with Giles initially refusing to undergo an additional examination on the ground that it was unnecessary and inappropriate in light of his SSA disability benefits award. JVG000250-51; *see Giles I*, ECF 49 at 16-18. Ultimately, on March 30, 2009, the Plan referred the matter to its Medical Director, Stephen S. Haas, M.D.

In the referral, the Plan's Benefits Coordinator advised Dr. Haas: "In anticipation of a rescheduled neutral evaluation, the NFL [Players Association] and NFL [Management Council] have asked that you review the enclosed file and determine if there is sufficient evidence to support [a determination that] the Player's T&P disability is related to football." JVG000255. Dr. Haas provided his opinion in a letter dated April 8, 2009, stating, JVG000256:

> I have reviewed the record of Mr. Giles.
>
> It is my opinion that some of the conditions for which he has been determined to be disabled, are definitely related to football. However, there is a significant element that is NOT football-related.
>
> That is his weight. The record shows that he weighed 230-240 pounds when he played. His weight in 2008 was recorded as "over 383."
>
> It is widely and unequivocally documented in the medical literature that obesity of this magnitude greatly exacerbates almost all medical conditions. This is especially true for spine and lower extremity conditions. Though many athletes may gain some weight after they discontinue formal training and conditioning programs, gains in excess of 150 pounds are far beyond even that seen in players who adopt a subsequent sedentary life style.

There have to be significant elements of behavior patterns and tendencies unrelated to football that conspire with the acknowledged disabilities in the record to produce the whole picture of Mr. Giles' unfortunate situation. . . .

His disability cannot reasonably be attributed totally to football.

The Plan forwarded Dr. Haas's opinion to plaintiff's counsel on April 22, 2009, and reiterated the Plan's insistence that Giles be evaluated by a neutral physician. *See* JVG000257. However, Giles persisted in his refusal to be examined. The Retirement Board denied Giles's appeal in May 2009, based on his failure to comply with the Plan's examination procedures. JVG 000265-69.

Giles's counsel wrote to the Plan on January 20, 2010, acknowledging that, under retroactive regulations of which he had previously been unaware, the Plan was entitled to ask a retired player receiving Social Security disability benefits to submit to an examination. *See* JVG000270. In response, the Plan agreed to refer Giles to a neutral physician, Glenn Perry, M.D., who examined Giles on April 7, 2010. JVG000276-77. Dr. Perry concluded that Giles's "orthopedic injuries described in themselves do not qualify the player for permanent and total disability. However, the orthopedic conditions described did result from injuries sustained while playing football in the NFL." JVG000281.

At its meeting of May 13, 2010, the Retirement Board again considered Giles's appeal. JVG000287-88. By letter of May 18, 2010, the Board notified plaintiff that it affirmed the decision of the Plan's Disability Initial Claims Committee to award T&P benefits at the Inactive category. Noting that its decision was "[b]ased on the reports of Drs. Perry and Haas," the Board determined: "Mr. Giles has a combination of impairments, some related to NFL football and others not related to NFL football." Further, it "concluded that, accounting solely for his NFL

football impairments and excluding the non-NFL football impairments, Mr. Giles would not be totally and permanently disabled." Therefore, it found that Giles was not entitled to Football Degenerative benefits, because "his total and permanent disability arises from other than League football activities." JVG000291. After the Retirement Board denied an August 2010 request to reopen the matter, see JVG000303, plaintiff filed suit.[8]

### E. Initial Cross-Motions for Summary Judgment

The parties' initial cross-motions for summary judgment, ECF 40, 41, were heard on May 31, 2012. ECF 45; see also ECF 62 (transcript of motions hearing of May 31, 2012). On November 20, 2012, this Court issued a Memorandum Opinion, remanding the matter to the Retirement Board for further consideration. Giles I, ECF 49; see also ECF 50 (Order).

In the Memorandum Opinion, I concluded that the Plan had abused its discretion in denying Football Degenerative benefits.[9] First, I found that it erred in requiring that, in order to qualify for Football Degenerative benefits, a player who meets the Social Security Awards standard must also satisfy the General Standard's requirement of a total inability to work, because such a requirement is contrary to the Plan's plain language. Id. at 37. Second, I determined that the Retirement Board improperly relied on the conclusions of Dr. Stephen Haas, the Plan's Medical Director, to determine that Giles's disability arose from his obesity rather

---

[8] Suit was initially filed in February 2011 in the United States District Court for the Northern District of Georgia. On April 4, 2011, the Plan moved to transfer the case to this Court. See ECF 7. The federal court in Georgia granted the motion on February 27, 2012. See ECF 26.

[9] The opinion also addressed two preliminary matters, not pertinent here. Specifically, I concluded that the Plan did not suffer from a conflict of interest, ECF 49 at 25-26, and that the Plan did not deny plaintiff the "full and fair review" guaranteed under ERISA. ECF 49 at 26-28.

than his football career.  *See id.* at 35.[10]  It was also unclear whether the Retirement Board had reviewed and considered two medical reports, prepared in connection with Giles's 1995 application, and which supported his position.  *Id.* at 37-38.  Accordingly, I remanded the matter for further consideration by the Board.  *Id.* at 39.

### F.  The Retirement Board's Decision on Remand

In a letter dated March 27, 2013, signed by Sarah Gaunt, the Plan Director, on behalf of the Retirement Board, the Board again denied Giles's request for reclassification.  JVG000751-56.

The letter acknowledged this Court's conclusion in *Giles I* that the Retirement Board's prior decision had "'suffer[ed] from two fatal defects.'"  JVG000753 (quoting ECF 49 at 32). But, the letter explained that, on remand, the Board had disregarded the statements of Dr. Haas, its former Medical Director, and confirmed that it had "reviewed the medical reports created in the prior application filed by Mr. Giles."  JVG000753.

---

[10] The position of "Medical Director" was established as of April 1, 2008, by Section 11.15 of the Plan, which authorizes the Retirement Board to designate "a board-certified physician as the Plan's Medical Director."  Plan § 11.15(a).  The Medical Director's duties include the provision of "medical advice with respect to the Plan's neutral physicians and medical examination procedures."  Plan § 11.15(b).  The Plan states that the "Medical Director will provide advice on medical issues relating to particular disability benefit claims as requested" by members of the Retirement Board.  *Id.*  However, the Plan prohibits the Medical Director from personally examining players, and states that the Medical Director "will not decide or recommend whether a particular Player qualifies for a disability benefit."  *Id.*

Notably, the position of Medical Director is distinct from the position of Medical Advisory Physician.  Unlike the Medical Director, the MAP is authorized to determine "whether a claimant medically is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit" under the General Standard for T&P disability, if the Retirement Board is deadlocked as to a particular player's T&P disability benefits claim.  Plan § 8.3(a).

In addition, the letter explained that the Retirement Board had decided to obtain Giles's entire Social Security file, "which previously had not been made available." JVG00753. According to the Board, in evaluating the Social Security award, it had to identify the "but for" cause of Giles's Social Security disability award. *Id.* The Retirement Board reasoned that if "the 'trigger' for [Giles's] Social Security disability award arose out of League football activities," Giles should be reclassified to the Football Degenerative category. *Id.* In contrast, "where another condition" that is not football-related "is the 'but for' cause" of the disability, then the Inactive category would be appropriate. JVG000753-754. The letter said, in part, *id.*:

> The Retirement Board found that the collective bargaining parties, who have sole authority to define the Plan's benefits, did not intend for a Player who is limited to sedentary work because of League football activities, and who receives an award of Social Security disability benefits due to a later change in status defined solely by rules established by the Social Security Administration, to receive Football Degenerative benefits.
>
> \*   \*   \*
>
> The Retirement Board noted that . . . the "but for" test requires the Retirement Board to grant Football Degenerative [benefits] where the football-related impairments actually caused the total and permanent disability, and to grant Inactive [benefits] where the other impairments caused the total permanent disability. So too here, the Retirement Board found, the correct interpretation of the Plan is to award Football Degenerative if the football-related conditions were the "but for" cause of the Social Security award, and to award Inactive where another condition is the "but for" cause.

The Retirement Board concluded that the "but for" cause of Giles's Social Security disability award was the "conjunction of [his] attainment of age 50 and [SSA] Medical Vocational Rule 201.14, which is the specific rule under which Social Security granted him disability benefits." JVG000754 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.14). Under Medical Vocational Rule 201.14, a claimant is eligible for a Social Security disability award where the individual (1) has a "work capacity" that is "limited to sedentary work as a

result of severe medically determinable impairment(s)"; (2) is a "[h]igh school graduate or more," such that the education level "does not provide for direct entry into skilled work"; (3) is a "skilled or semi-skilled" worker whose "skills [are] not transferrable"; and (4) is "[c]losely approaching advanced age," *i.e.*, has reached age 50 but is not yet 55 years old. *See id.*; *see also* JVG000758 ("Disability Determination and Transmittal Form" for Giles, reflecting 201.14 classification).

Notably, the Board "concede[d] that Mr. Giles is limited to sedentary employment due to orthopedic impairments that *arise out of League football activities*." JVG000754 (emphasis added). It also recognized that plaintiff's "physical limitations are consistent with his work history." *Id.* However, the Board determined that plaintiff's "discontinuation of work activity did not trigger the Social Security award," as Giles apparently had "stopped working months before he became eligible for Social Security disability benefits." *Id.*

The Board also noted the various changes in plaintiff's Social Security onset dates, stating in the letter, JVG000755:

> Ultimately, the onset date was changed by a Social Security examiner to November 1, 2004, to coincide with the beginning of the month in which Mr. Giles reached age 50 (his date of birth was November 8, 1954). The Retirement Board noted that, had Mr. Giles not reached age 50, he would not have qualified for Social Security benefits. Specifically, Mr. Giles would not have been "closely approaching advanced age," and thus would have been classified instead within Medical Vocational Rule 201.21, a category that does not result in an award of benefits. 20 CFR Part 200, Appendix 2, Table 1, at 201.14. This is evidenced by the examiner's narrative entry of June 24, 2008, which reads: "Claimant is currently alleging 1/2/04 as his AOD [alleged onset date]. Per that AOD claimant would not meet the vocational requirement because of his age 1/1/04. Therefore claimant will be given 11/1/04 as this is when claimant meets the requirement for med/voc allowance given because of his age at this adverse onset." See Exhibit 4; see also Exhibit 6 (Explanation of Determination).

Further, the letter explained, *id.*:

The Retirement Board . . . has never considered the mere passage of time or aging, without a worsening or degeneration of the underlying football-caused medical impairments, to "arise out of League football activities." It also determined that attainment of age 50 was a precondition to Mr. Giles' award of Social Security benefits that bears no relation to League football activities. Rather, it relates solely to a set of rules promulgated by the Social Security Administration for adjudicating claims under the Social Security disability program. The Retirement Board concluded that the intent of the collective bargaining parties was to classify a Player in the Inactive category where there is a clear, non-football cause of eligibility.

Following the Retirement Board's decision on remand, plaintiff's counsel expressed concern that the Board had not fully considered all of the relevant documents in rendering its decision. *See* Plan Mem. at 12 & Exh. 1 (ECF 65-2). At its meeting in May 2013, the Retirement Board reviewed its decision of March 27, 2013, but declined to alter it. ECF 65-2.

### G. Pending Cross-Motions for Summary Judgment

In moving for summary judgment, plaintiff argues that the Retirement Board's denial on remand is contrary to both *Giles I* and the plain wording of the Plan. Giles Mem. at 3. Giles emphasizes that, in the Board's letter of March 27, 2013, the Board "conceded that Plaintiff was limited to sedentary employment due to orthopedic impairments that arose out of League football activities," Giles Mem. at 2-3 (citing JVG000754); *see id* at 4, 9; Giles Reply at 3, 5-6, 8. Thus, Giles contends that he "has established that he has met the qualifications for entitlement to football degenerative benefits." Giles Mem. at 4; *see* Giles Reply at 8.

Plaintiff challenges on several grounds the Plan's reliance on his age as a reason for denying Football Degenerative benefits. Age is one of several factors the SSA used to determine whether disability benefits are warranted. But, plaintiff maintains that the Plan has adopted a novel and unsupported position in applying the "arises out of League Football activities" requirement not only to the medical condition giving rise to his disabled status, but also to his

age. *See* Giles Mem. at 9-10; Giles Reply at 3. As plaintiff notes, the Retirement Board insists that the collective bargaining parties, who defined the Plan's scope, intended to bar a former player limited to sedentary work due to football from receipt of Football Degenerative benefits, where the player qualifies for Social Security disability benefits based on a change in status under the SSA's rules governing disability benefits. *See* Giles Mem. at 8 (citing JVG000753); Giles Reply at 6 (same). According to plaintiff, the Retirement Board has offered no support for that position. *See id.* In his view, the Plan's provisions do not support such a limitation on players who qualify for Plan benefits under the Social Security Awards standard. *See id.*

Furthermore, Giles asserts that the Plan's decision to apply the "arises out of League Football activities" test to his age was untimely, coming four years after the Plan learned that plaintiff's age contributed to his Social Security disability award. Giles Mem. at 5 (citing JVG000240, letter from Giles's counsel to Plan, dated January 8, 2009); *see also* JVG000206-08 (Vocational Analysis Worksheet reflecting age and other criteria). This "completely different interpretation" of that phrase, he says, constitutes an improper *post hoc* rationalization for denying Football Degenerative benefits. *See* Giles Reply at 3-4.

In addition, plaintiff argues that the Plan has yet to consider materials that it was required to review, citing the lack of date stamps on several early medical reports. Giles Mem. at 4. Instead, argues Giles, the Retirement Board chose to review Giles's Social Security file, despite the lack of any request by the Court that it do so. *See* Giles Reply at 5.

Giles also insists that the denial is contrary to ERISA regulations found at 29 C.F.R. § 2560.503-1(g), which are reflected in the Plan. *See* § 11.6(a)(3) and (5). Giles Mem. at 6. According to plaintiff, the Plan ran afoul of those provisions by failing to inform him before the

March 2013 denial either that age was a factor or that he would need to meet the Plan's General Standard in order to obtain Football Degenerative benefits.  *See id.* at 6-9.

In its cross-motion, the Plan maintains that the Retirement Board acted within its discretion in concluding that the "trigger" for a player's total and permanent disability must "arise from League football activities," and that the SSA award does not establish that Giles met that criterion.  *See* Plan Mem. at 1-2, 5.  The Plan contends that the Board properly examined Giles's Social Security file in order to identify the "but for" cause of his Social Security award. *See id*. at 9.  In the Plan's view, the Social Security record demonstrates that Giles's disability was triggered not by League football activities, but instead by his reaching the age of 50. Therefore, it insists that Giles is not entitled to Football Degenerative benefits.  *See id.* at 5, 10-11, 15.

Further, the Plan states that it complied with *Giles I* in assessing Giles's claim on remand. It points out that, in reconsidering Giles's claim, the Board disregarded the statements of Dr. Haas, Plan Mem. at 8 (citing JVG000256, 754) and 14 (same), while reviewing and considering the reports of Dr. Tria and Dr. Unger, who had examined Giles in connection with his 1995 application for benefits.  *Id.* at 8, 14; Plan Reply at 9-10.

The Retirement Board's decision, the Plan emphasizes, was reasonable, supported by substantial evidence, and consistent with the intent of the collective bargaining parties.  *See* Plan Mem. at 15-18; *see also* Plan Reply at 4-5.  It concludes that, under the applicable standard of review, this Court should not disturb the Board's determination.  *Id.* at 18-20.

Additional facts are included in the Discussion.

## II.  Discussion

### A.  Standard of Review

As a participant in a plan covered by ERISA, plaintiff is entitled to bring an action "to recover benefits due to him under the terms of his plan."  ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).  When reviewing a denial of benefits under an ERISA-governed plan, a district court must first determine "whether the relevant plan documents confer discretionary authority on the plan administrator."  *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011).  Under Section 8.2 of the Plan, the Retirement Board is designated as the "'named fiduciary' of the Plan within the meaning of section 402(a)(2) of ERISA," and is granted the authority to interpret and construe the terms of the Plan.

When, as here, an ERISA plan vests its administrator or another fiduciary (in this case, the Retirement Board) with discretionary authority to construe the terms of the plan and determine eligibility for benefits, the plan's eligibility determination is subject to review only for abuse of discretion.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-15 (1989); *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013); *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010); *Boyd v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 796 F. Supp. 2d 682, 689 (D. Md. 2011).  In reviewing a plan's determination under the deferential abuse of discretion standard, a court is limited to the evidence known to the plan administrator when it rendered the decision under review.  *Helton v. AT&T Inc.*, 709 F.3d 343, 352 (4th Cir. 2013); *see also Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994) (reviewing court may consider only information before plan administrator at the time decision was made);

*Brodish v. Fed. Express Corp.*, 384 F. Supp. 2d 827, 833 (D. Md. 2005) ("Generally, the Fourth Circuit defines the administrative record as those facts known to the administrator at the time the administrator made the benefits eligibility determination.").

The standard of review in the ERISA context "equates to reasonableness: [A court] will not disturb an ERISA administrator's discretionary decision if it is reasonable." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008) (citations omitted). "At its immovable core," the standard requires that a court "not reverse merely because it would have come to a different result in the first instance." *Id.* Thus, a reviewing court may not overturn a benefit decision that results from a "'deliberate, principled reasoning process'" and that "is supported by 'substantial evidence,'" even if the court "would reach a different decision independently." *Helton*, 709 F.3d at 351 (citation omitted).

Substantial evidence is such relevant and probative evidence that a reasonable mind would accept as adequate to support a particular conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619-20 (1966); *Marine Repair Services, Inc. v. Fifer*, 717 F.3d 327, 334 (4th Cir. 2013); *Island Creek Coal Co. v. Compton*, 211 F.3d 203, 207-08 (4th Cir. 2000). The substantial evidence standard requires more than a mere scintilla, but less than a preponderance of the evidence. *See Richardson*, 402 U.S. at 401; *Consolo*, 383 U.S. at 620; *Marine Repair Services, Inc.*, 717 F.3d at 334; *Ashland Facility Operations, LLC v. N.L.R.B.*, 701 F.3d 983, 989 (4th Cir. 2012). It "does not mean a large or considerable amount of evidence[.]" *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988). Nor is it the court's function to reweigh the evidence. *Consolo*, 383 U.S. at 620; *see*

*also, e.g., Radford v. Colvin*, --- F.3d ----, 2013 WL 5790218, at *7 (4th Cir. Oct. 29, 2013);

*Westmoreland Coal Co., Inc. v. Cochran*, 718 F.3d 319, 324 (4th Cir. 2013).

In *Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000), the Fourth Circuit outlined eight factors to consider in evaluating the reasonableness of a benefit decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Regarding the first factor, which pertains to a plan's language, a claimant's entitlement to benefits "turn[s] on the interpretation of the terms in the plan at issue." *Firestone Tire*, 489 U.S. at 115. "Courts construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'" *US Airways, Inc. v. McCutchen*, ___ U.S. ____, 133 S. Ct. 1537, 1549 (2013) (quoting *Firestone Tire*, 489 U.S. at 113).

An ERISA plan "administrator's discretion never includes the authority 'to read out unambiguous provisions' contained in an ERISA plan." *Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 639 (4th Cir. 2007) (quoting *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005), *cert. denied*, 547 U.S. 1148 (2006)), *abrogated on other grounds by Metropolitan Life Ins. Co.*, 554 U.S. at 116; *accord Savani v. Washington Safety Mgmt. Solutions, LLC*, 474 F. App'x 310, 314 (4th Cir. 2012) (per curiam). Indeed, to ignore the plain language of the plan "constitutes an abuse of discretion." *Blackshear*, 509 F.3d at 639; *accord Day v. AT&T Disability Income Plan*, 685 F.3d 848, 853 (9th Cir. 2012) ("'ERISA plan

administrators abuse their discretion if they . . . construe provisions of the plan in a way that conflicts with the plain language of the plan.'") (citation and some internal quotations marks omitted); *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 362 (7th Cir. 2011) ("'[U]nambiguous terms of a[n] [ERISA] plan leave no room for the exercise of interpretive discretion by the plan's administrator.'") (citation omitted); *Admin. Comm. of Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Gamboa*, 479 F.3d 538, 542 (8th Cir. 2007) ("An interpretation that conflicts with the plain language of a health and welfare plan is an abuse of discretion . . . .").

## B.  Preliminary Matters

Before reaching the heart of the parties' dispute, several preliminary issues must be addressed.

First, plaintiff cites a lack of recent date stamps on certain documents as evidence that the Retirement Board did not actually review them.  Giles Mem. at 4 (citing JVG000432-733; 735-40; 743-48; 758-74).  As plaintiff correctly notes, I explained in *Giles I* that because copies of medical reports prepared in connection with the 1995 benefits application had no date stamps later than 1996, it was not apparent whether the Board considered them in connection with the 2008 benefits application.  ECF 49 at 37.  But, I made clear that, on remand, these medical reports were to be taken into consideration.

The Plan asserts that, on remand, the Retirement Board reviewed and considered the reports of Dr. Tria and Dr. Unger that dated from the 1995 application.  Plan Mem. at 8, 14; *see also* JVC000753.  Indeed, the Retirement Board expressly indicated that it complied with my instructions.  JVG000753.  To that end, the Retirement Board's denial letter of March 27, 2013,

referred to Dr. Tria's examination and attached that report as an exhibit. JVG000754, 759-63 (Exh. 2). I am satisfied that the Board complied with my directive.

Second, plaintiff complains that the Retirement Board's decision contravened the requirements of an ERISA regulation found at 29 C.F.R. § 2560.503-1(g). Giles Mem. at 6-9. That provision requires an adverse benefit determination to include, *inter alia*, a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.]" 29 C.F.R. § 2560.503-1(g)(1)(iii). Under the regulation, certain plans must also provide any "internal rule, guideline, protocol, or other similar criterion [that] was relied upon in making the adverse determination," or must advise the claimant that a copy of such authority is available free of charge. *Id.* § 2560.503-1(g)(1)(v)(A).

The ERISA regulation is incorporated into Plan § 11.6(a)(3) and (a)(5). Specifically, the Plan provides that a notice of an adverse determination will contain "a description of additional material or information, if any, needed to perfect the claim and the reasons such material or information is necessary[,]" Plan § 11.6(a)(3), as well as "any internal rule, guideline, protocol, or other similar criterion relied on in making the determination (or state that such information is available free of charge upon request)[.]" *Id.* § 11.6(a)(5).

In support of his argument, Giles relies on the Retirement Board's purported failure to notify him, prior to its letter of March 27, 2013, either that his age was an issue or that, under the Plan's reading, he might have to qualify under the Plan's General Standard to receive Football Degenerative benefits. *See* Giles Mem. at 6. As a result, plaintiff maintains that he was precluded from pursuing a Social Security appeal, through which he might have been able to

establish an inability to perform even sedentary work. *See* Giles Mem. at 6-9. Here, however, that possibility seems remote. At a hearing before this Court on May 31, 2012, plaintiff's counsel indicated that Giles could perform sedentary work. ECF 62 (transcript of motions hearing of May 31, 2012) at 22 ("Giles can do sedentary work."); *see also, e.g.*, *Giles I*, ECF 49 at 33 (noting that "Giles is capable of performing sedentary work"). Accordingly, plaintiff has not shown that he was prejudiced through any failure of the Plan to inform him that age was a relevant factor. *See* Giles Mem. at 6. Unless a party can show "'a causal connection between [an ERISA procedural defect] and the final denial of a claim,'" there can be no abuse of discretion based on a violation of 29 C.F.R. § 2560.503-1. *See Donnell v. Metropolitan Life Ins. Co.*, 165 F. App'x 288, 296-97 (4th Cir. 2006) (citation omitted).

Third, plaintiff insists that the Plan has improperly offered a *post hoc* justification for the denial, of a type that other courts have rejected. As plaintiff explains, for four years the Plan consistently interpreted the phrase "arises out of League football activities" to refer to the medical condition giving rise to Giles's Social Security disability award. Giles Reply at 3. But, in the letter of March 27, 2013, the Retirement Board offered a new interpretation of "arises out of League football activities" that no longer focuses solely on a player's underlying medical condition. *Id.* Instead, plaintiff says, the Plan has taken the position that "turning age 50 was the reason the [SSA] granted Giles' claim, and turning age 50 is not connected to League Football activities." *Id.* at 2. According to plaintiff, by relying for the first time on his age category, a factor that the SSA considered in rendering his Social Security disability award, the Plan improperly invoked a *post hoc* rationalization for its prior benefits denial. *See id.* at 3-4.

The ERISA cases that plaintiff cites, however, do not squarely support his position. That is because they involve information or arguments that, unlike the explanation that the Retirement Board provided to Giles in the letter of March 27, 2013, were absent from the administrative record and instead first appeared only during litigation. In *Glista v. Unum Life Ins. Co. of America*, 378 F.3d 113 (1st Cir. 2004), for instance, the First Circuit concluded that, under the circumstances presented, a plan administrator was barred from raising a new argument during litigation that was not articulated previously to the claimant. *See id.* at 131. *See also Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 397 (5th Cir. 1998) (administrator could not rely on argument raised for first time during litigation); *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 790 (4th Cir. 1995) ("A plan administrator cannot introduce evidence *post hoc* to support its benefit determination when the district court reviews that decision under a deferential standard."); *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1007 (4th Cir. 1985) (district court erred in admitting evidence not before the plan administrator).

As discussed, *infra*, the Retirement Board offered a new justification for the denial of Football Degenerative benefits in its letter of March 27, 2013. Nevertheless, this is not a situation in which, as in *Glista*, a plan's justification was wholly absent from the administrative record and instead first appeared during post-denial litigation. Plaintiff has cited no authority recognizing a categorical rule that bars a plan administrator on remand from relying on a new reason to support a prior benefits decision, nor is the Court aware of any cases indicating as much. To be sure, belated arguments or inconsistencies might undermine the persuasive weight of a plan administrator's justification on remand. Plaintiff, however, has identified no bar on *post hoc* rationalizations applicable to the circumstances presented here.

C.  Football Degenerative Benefits and the Social Security Award Standard

The remaining issue is whether the Retirement Board abused its discretion in denying Football Degenerative benefits on the ground that because Giles's Social Security disability award was "triggered" by his reaching the age of 50, his disability did not "arise[] out of League football activities" within the meaning of the Plan.  As explained below, under the circumstances attendant here, the denial on this basis constituted an abuse of discretion.

Two aspects are central to my conclusion: a factual concession made by the Plan, and the structure of the Plan's benefits determinations.  Regarding the first aspect, the Retirement Board, on remand, "concede[d] that Mr. Giles is limited to sedentary employment due to *orthopedic impairments that arise out of League football activities*."  JVG000754 (emphasis added).  That admission is striking, evidencing that the Plan abandoned its core argument prior to remand: namely, that Giles's disability resulted from his obesity, not from injuries sustained during his professional football career.  *See, e.g.*, JVG000289-92 (denial letter of May 18, 2010); *Giles I*, ECF 49 at 28, 34-35 (discussing Plan's reliance on Giles's obesity as cause of his disability).  Indeed, noticeably absent from the Retirement Board's denial letter of March 27, 2013, is any reference to Giles's obesity.  JVG000751-56; *see also* Plan Mem. at 14 (noting lack of reference to obesity in letter).  Nor does the Board cite any factor, beyond Giles's professional football career, that contributed to his medical condition.  *See* JVG000751-56.  Instead, the Board pivots to a new rationale, premised on the basis for the award of Social Security disability benefits to Giles.

Assessing the Retirement Board's denial requires a clear understanding of how the Plan structures its benefits decisions.  As explained, *infra*, this determination is a two-step process.

First, the player must qualify as totally and permanently disabled, either under the General Standard, Plan § 5.2(a), or the Social Security Awards standard, Plan § 5.2(b). Second, if a player is found to be totally and permanently disabled, the level of benefits must be determined under criteria found in Plan § 5.1. As I summarized previously in *Giles I*, ECF 49 at 34:

> [T]he provisions of the Plan make clear that there are two alternative methods—the General Standard under Plan § 5.2(a) and the Social Security Awards standard under Plan § 5.2(b)—by which a player may demonstrate that he is totally and permanently disabled. Once the player has done so, the method by which the player established his disability is irrelevant to the level of benefit to which he is entitled. Rather, pursuant to Plan § 5.1, the level of benefits hinges on whether the player's established disability arose out of League football activities.

Plan § 5.8(b)(1), which recognizes the Social Security Awards path to qualifying for T&P disability benefits, is silent as to the level of T&P benefits (Football Degenerative, Inactive, or otherwise) to which the player is entitled. *See* Plan Mem. at 4 n.12. When, as here, the issue is whether a player found eligible for T&P benefits qualifies for Football Degenerative benefits or, instead, for Inactive benefits, the answer turns solely on whether the player's disability "arises out of League football activities." *See* Plan § 5.1(c)-(d). The Plan explains, Plan Mem. at 4:

> Under the Applicable Plan provisions, a player's receipt of SSA disability benefits means only that the Board should deem the player totally and permanently disabled. Once that determination is made, the Board must then apply the relevant Plan provisions to determine which categories of T&P benefits the player should receive.

### 1. Step One: T&P Eligibility

The first step of the analysis requires the Retirement Board to determine whether a player qualifies for T&P disability benefits. As indicated, a player may do so under either of two standards: the General Standard or the Social Security Awards standard. *See* Plan § 5.2. There is no dispute that Giles is totally and permanently disabled, based on his receipt of Social

Security disability benefits. The Plan has granted and continues to pay Giles T&P disability benefits. Again, the question here is the category of T&P disability benefits—Football Degenerative or Inactive.

For Social Security disability applicants who, like Giles, remain capable of performing sedentary work, the individual's age is one component of the SSA's disability determination. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a) (addressing disabilities that "cannot be evaluated [based] on medical considerations alone"). In the context of those disabilities, the starting point for Social Security's eligibility determination is the individual's "residual functional capacity." *See id.* § 200.00(c) and Table 1. SSA regulations describe "residual functional capacity" as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs[.]" *Id.* § 200.00(c). For an individual (such as Giles) whose "residual functional capacity" allows for sedentary work, the Social Security formula relies on three "vocational factors"—"age, education, and work experience"—to determine whether disability benefits are warranted. *Id.* § 201.00(a); Table 1.[11]

The age categories applicable to individuals limited to sedentary work include "advanced age" (55 and over); "closely approaching advanced age" (50-54), which is the category into which Giles fell; "Younger individual age 45-49"; and "Younger individual age 18-44." *See id.* Table 1; *see also id.* § 201.00(g) and § 202.00(d). As governing SSA regulations explain,

---

[11] Similarly, the "vocational factors" of age, education, and work experience determine eligibility for disability benefits where individuals' "residual functional capacity" limits them to "light work" or to "medium work." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 2 (light work) and Table 3 (medium work); *see also id.* § 201.00(a). As noted, unlike individuals who suffer from more severe disabilities, cases involving claimants such as Giles who retain some limited ability to work "cannot be evaluated on medical considerations alone[.]" *Id.* § 201.00(a).

"[i]ndividuals approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to sedentary work. When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disability normally obtains." *See id.* § 201.00(g).

Of import here, the SSA was not required to determine whether Giles's "residual functional capacity" resulted from his professional football career or, instead, from some other cause. Simply put, causation was not relevant to the SSA's disability determination. Rather, once the SSA confirmed that Giles's "residual functional capacity" limited him to sedentary work, the only remaining question was whether his "vocational factors" of age, education, and work experience qualified him for disability benefits. *See id.* § 201.00(a); Table 1.

Plan § 5.2 recognizes receipt of Social Security disability awards as a basis for T&P eligibility, and the Plan has accepted Giles's eligibility for T&P benefits. *See, e.g.*, Plan Mem. at 6.[12] Likewise, Plan § 5.8(b)(1) confirms that, where certain timing requirements not in doubt here are met, "[a] . . . player will be deemed totally and permanently disabled for all months in which he receives disability benefits from either the Social Security disability insurance program or Supplemental Security Income program[.]" In other words, the plain language of Plan § 5.2(b) and § 5.8(b)(1) reflects an intent to grant total and permanent disability status to all players receiving valid Social Security benefits. *See id.* Neither of these provisions, however, informs the level of T&P benefits due to a player who qualifies as totally and permanently

---

[12] Plan § 5.2 contains one exception, which is not at issue. Under that exception, if four voting members of the Retirement Board determine that the player is receiving Social Security benefits fraudulently, and is not totally and permanently disabled, then he would be ineligible for T&P status. *See* JVG000343 (Plan § 5.2(b)). Here, there is no question that Giles's Social Security disability award is valid.

disabled pursuant to the Social Security Awards standard.  The only question here is the level of benefits to which Giles is entitled.

2.  Step Two:  Level of T&P Benefits Due

The second step of the benefits analysis requires the Retirement Board to determine the appropriate level of T&P benefits.  *See* Plan § 5.1.  As noted several times, the issue here is whether Giles is entitled to Football Degenerative benefits under Plan § 5.1(c), or Inactive benefits under Plan § 5.1(d).  That determination depends entirely on whether Giles's "disability(ies) arises out of League football activities."  *See* Plan § 5.1(c)-(d).  That matter was never addressed by the SSA.

Plan § 6.4(c) defines "arising out of League football activities" as "a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by the Employer, including all required or directed activities."[13]  That provision also contains three exclusions, under which a disability will not be found to "arise[] out of League football activities."  Plan § 6.4(c).  The first two define "arising out of League football activities" to exclude "any disablement resulting from other employment" or from "athletic activity for recreational purposes[.]"  *Id.*  Those two exclusions are not pertinent here.  The third exception states that "'[a]rising out of League football activities' does not include . . . a disablement that would not qualify for benefits but for an injury (or injuries) or

---

[13] As noted, this definition is located outside the T&P disability benefits provisions in Plan § 5.  But, the Board relies on the § 6.4 definition, *see* Plan Mem. at 1, 5; Plan Reply at 4-5, as have other courts in cases involving T&P disability benefits.  *See, e.g.*, *Washington v. Bert Bell/Pete Rozelle NFL Ret. Plan*, *supra*, 504 F.3d at 821 n.4.

illness that arises out of other than League football activities." *Id.*; *see also* Plan Mem. at 1, 5; Plan Reply at 4-5 (quoting third exception).

The parties offer conflicting interpretations of this test for whether a "disability" is one that "arises out of League football activities." In essence, the parties disagree as to the meaning of the term "disability" as it is used in Plan § 5.1.[14] In Giles's view, the relevant question is whether a player's "*medical condition*" that resulted in a Social Security award "arises out of League football activities." *See* Giles Mem. at 9 (emphasis in original). Under Giles's reading, the term "disability" refers to the player's physical condition. By contrast, according to the Plan, it is insufficient for a player's injuries to have "arise[n] out of League football activities." Instead, the factor that "triggers" a player's eligibility for a Social Security disability award also must have "arise[n] out of League football activities." *See, e.g.*, Plan Mem. at 1; JVG000753 (letter of March 27, 2013). In other words, the Plan asserts that "disability" means not only a player's physical impairment, but also his status as disabled pursuant to Social Security criteria.

### a. Evolving interpretations of the Plan

The Plan—at least before its decision on remand—had endorsed an interpretation equivalent to the one now advanced by Giles. Specifically, the Plan consistently argued that the level of T&P benefits turns on whether a player's "injuries" or "inability to work" "arises out of League football activities." Examples of that interpretation are legion. *See* ECF 40-1 (Plan's "Memorandum of Law in Support of its Motion for Summary Judgment," April 20, 2012) at 1

---

[14] The relevant portions of Plan § 5.1(c) and (d) use the term "disability(ies)," whereas Plan § 6.4(c), which defines "[a]rising out of League football activities," uses "disablement." Neither party attaches any significance to these variations, and for simplicity I generally will use the term "disability."

("The basic issue in this case is whether [Giles's] present inability to work 'arises out of' NFL football."), 2 ("the Retirement Board was forced to conclude that Mr. Giles' inability to work does not arise from NFL football. He therefore receives disability benefits in the 'Inactive' category, rather than the higher 'Football Degenerative' benefits he seeks."), and 16 ("the Board scheduled Mr. Giles for a medical examination with a neutral physician . . . because there was no affirmative evidence in Mr. Giles' medical record demonstrating that his present *orthopedic injuries arose from football*") (emphasis added).

Counsel for the Plan reiterated this argument at the motions hearing held on May 31, 2012. *See, e.g.*, ECF 62 (Transcript) at 69 ("[T]he total and permanent disability is not football related if the player would not qualify for benefits but for an injury or injuries that arise out of other than NFL league activities. So we would submit that that primary diagnosis of obesity would render Mr. Giles ineligible for the football degenerative benefits."). Moreover, in a post-hearing memorandum dated June 11, 2012, the Plan stated: "To be entitled to a higher level of total and permanent disability (T&P) benefits, [Giles's] inability to work must 'arise out of League Football activities' within the meaning of the Plan." ECF 48 at 1.

Critically, in applying that formulation of the "arises out of League football activities" test, the Plan consistently sought to determine whether Giles's physical condition "ar[ose] out of League football activities." *See, e.g.*, JVG000247 (letter from Board to Giles dated February 23, 2009, stating that Board "tabled its consideration of your appeal to allow additional time for you to be evaluated by the neutral physician and for the neutral physician to complete his report"); JVG000268 (letter from Board to plaintiff's counsel dated May 28, 2009, explaining the need for a physical examination of Giles "to help assess the causation issues involved in the appeal" and

observing that "it does not have any recent, thorough medical reports" in its possession); ECF 40-1 at 11 (noting that in May 2009 the Board observed that it lacked "'any recent, thorough medical reports' that would support a determination that Mr. Giles' disabilities arose out of NFL football activities."); ECF 42 (Plan's Reply of May 16, 2012) at 2 (discussing need for a physical examination to determine whether Giles's "inability to work arises out of NFL football" alone or also from his obesity). In stark contrast, the record—at least before the denial letter of March 27, 2013—is devoid of suggestion that assessing whether a "disability" (or an "inability to work") "arises out of League football activities" required the Plan to examine the basis for Giles's eligibility status under the Social Security criteria.

In its decision on remand, however, the Plan abandoned its argument that the medical condition limiting Giles's ability to work resulted from anything other than his NFL career. As indicated, in its letter of March 27, 2013, the Retirement Board "concede[d] that Mr. Giles is limited to sedentary employment due to orthopedic impairments that arise out of League football activities." JVG000754; *see* Giles Mem. at 2-3.

Nevertheless, the Plan has not accepted Giles's eligibility for Football Degenerative benefits. In essence, the Plan seeks to redefine the test for determining whether a "disability" is one that "arises out of League football activities." The Plan insists that, in order to qualify for Football Degenerative benefits, it is not enough for a player's injuries to have "arise[n] out of League football activities"; the player's *status* as disabled pursuant to the Social Security disability classification scheme *also* must have "arise[n] out of League football activities." As the Retirement Board explained, it "would reclassify Mr. Giles to the Football Degenerative category if the trigger for his Social Security award arose out of League football activities, but

deny reclassification otherwise." JVG000753 (letter of March 27, 2013). Applying this new formulation of the test, the Plan concluded that because Giles qualified for Social Security disability benefits only because he reached the age of 50, his disability cannot be said to "arise[] out of League football activities," and thus he is ineligible for Football Degenerate benefits. *See, e.g.*, Plan Mem. at 15; Plan Reply at 5.

Before addressing other defects in the Plan's argument, I note that the Plan could have raised this argument years ago—and, if it had merit, could have simplified the denial of Football Degenerative benefits. As the administrative record reflects, the Plan knew since as early as January 2009 that Giles's Social Security award arose under Vocational Rule 201.14. *See* JVG000239-41; JVG000206. In a letter to Plan Director Sarah Gaunt dated January 8, 2009, plaintiff's counsel laid out the basis for Giles's Social Security award. JVG000240-41. In particular, he explained, *see id.*:

> [B]ased upon Mr. Giles' age (over 50), his education and residual functional capacity limited to sedentary work, he was unable to perform past relevant jobs as an insurance sales agent or a manager of food services. [The SSA examiner] also felt that any skills Mr. Giles[] may have acquired in his past work would not be transferrable to jobs within his residual functional capacity. Accordingly, Social Security Vocational Rule 201.14 was applicable and directed a finding that he is disabled.
>
> \*   \*   \*
>
> Social Security Vocational Rule 201.14 provides that when a person is closely approaching advanced age (50-54), is a high school graduate or more but his education does not provide for direct entry into skilled work[, and] he is unable to perform his past relevant work and any skills acquired are not transferrable, a finding that he is "disabled" is directed. (20 CFR, Appendix 2 to subpart P of part 404) . . . .

Plaintiff's counsel also stated that he enclosed the Vocational Analysis Worksheet to the letter of January 8, 2009. *See* JVG000240. It reflects that Giles's Social Security award was

based on Rule 201.14. JVG000206-08. Like the letter from plaintiff's counsel dated January 8, 2009, the Vocational Analysis Worksheet bears date stamps of February 12, 2009; May 14, 2009; February 18, 2010; and May 13, 2010. *See id.*; JVG000239-41. Those "date stamps indicate dates on which each document was reviewed by the Retirement Board." *Giles I*, ECF 49 at 38. Additionally, in his letter to the Plan of January 8, 2009, Giles's counsel stated that he attached a second document, Social Security's Disability Determination and Transmittal form, which, among other things, reflects the Rule 201.14 classification. JVG000240.[15]

Even if those explanations were not sufficiently clear, had the Retirement Board consulted the SSA regulations cited by Giles's counsel, it would have been readily apparent to the Board in early 2009 that Giles's Social Security award was dependent, in part, on his age. SSA regulations state that individuals deemed disabled pursuant to Rule 201.14 are so classified based on their ability to perform only sedentary work, their age of 50 to 54 years, and prior education and skills that are not transferable to skilled, sedentary employment. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. On the other hand, an individual limited to sedentary work, with Giles's education and previous work experience, but who is 49 or younger, would be deemed "Not disabled" under Rule 201.21. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1. The Retirement Board recognized as much in its letter of March 27, 2013. JVG000755 (explaining that, prior to reaching age 50, Giles would have been classified by the SSA under Rule 201.21, which does not result in an SSA disability award).

---

[15] Although this document can be found in the supplemental, post-*Giles I* portion of the administrative record, *see* JVG000729, JVG000758, it apparently was not included in the earlier record. The omission is of no consequence, however, because, in addition to receiving the letter from plaintiff's counsel dated January 8, 2009, the Retirement Board apparently reviewed the Vocational Analysis Worksheet (JVG000206-08) multiple times during 2009 and 2010.

In its denial letter of March 27, 2013, the Retirement Board explained that, in making its latest determination, it "obtained and reviewed the entire Social Security file" in order to "help assess" Giles's Social Security award.  JVG000753.  The Plan thus suggests that it only became aware of the grounds for Giles's Social Security award upon its review of additional Social Security documents upon remand following *Giles I*.  *See* Plan Mem. at 10 ("A thorough review of the newly-obtained SSA file revealed that Mr. Giles qualified as 'disabled' for SSA purposes exclusively under Medical Vocational Rule 201.14.").  As evident from the facts recounted above, however, that portrayal ignores the information made known to the Plan as early as January 2009, when plaintiff's counsel advised the Plan of the specific factors—including age— underlying Giles's Social Security award.

In any event, if Giles was ineligible under the Plan for Football Degenerative benefits because his SSA award depended on his reaching the age of 50, the process of evaluating Giles's physical injuries—which required the Retirement Board to scrutinize medical records from multiple physical examinations, dating from as early as 1995—was unnecessary.  In other words, the Retirement Board could have determined, based on the information it received in January 2009, that because Giles's disabled status under the SSA's criteria was dependent on his age, he was ineligible for Football Degenerative benefits.  Instead, the Retirement Board, operating under the belief that assessing whether Giles's disability "ar[ose] out of League football activities" required it to determine the cause of Giles's physical impairment, undertook the more difficult task of reviewing Giles's medical history in an effort to ascertain whether it was his football career or his obesity that caused his inability to work.  *See, e.g.*, JVG000290-91 (Retirement Board letter dated May 18, 2010).  It invoked the issue of age only upon determining

on remand after *Giles I* that it could no longer dispute that Giles's injuries, limiting him to sedentary work, arose from his NFL career.

### b. The "arises out of League football activity" test under the Plan

Turning to the Plan itself, the language and structure of the Plan confirm that whether a "disability" "arises out of League football activity" depends upon the cause of the former player's medical condition. Accordingly, the interpretation that the Plan now offers is unavailing.

To begin, the Retirement Board has essentially endeavored to determine whether individual "vocational factors" used by the SSA "arise[] out of League football activities," which is contrary to Plan § 6.4. The exclusion found in Plan § 6.4, on which the Plan relies, *see* Plan Mem. at 1, 5; Plan Reply at 4-5, states that "arising out of League football activities" excludes "a disablement that would not qualify for benefits but for an *injury (or injuries) or illness* that arises out of other than League football activities." Plan § 6.4(c) (emphasis added). Reaching a new Social Security age category simply is not an "injury" or an "illness." Indeed, all of the exclusions recognized under Plan § 6.4(c)—a disablement caused by "other employment"; a disablement caused by "athletic activity for recreational purposes"; or an "injury (or injuries) or illness that arises out of other than League football activities"—address possible alternate causes of a player's medical condition. By contrast, Plan § 6.4(c) provides no justification for extending the "arises out of League football activities" analysis to the "vocational factors" that the SSA uses to determine independently whether a disability award is warranted under SSA standards.

Likewise, other Plan provisions lend no support to reexamining the SSA's "vocational factors" as a means to determine the appropriate level of T&P disability benefits. Simply put,

there is no suggestion in Plan § 5.2, § 5.8, or elsewhere, indicating that the Board should analyze the "vocational factors" underlying a valid SSA award as a means to decide whether a disability "arises out of League football activities." Similarly, neither Plan § 5.2 nor Plan § 5.8 contains any suggestion that a player receiving a Social Security disability award, in order to qualify for Football Degenerative benefits, must make some further showing as to how he became eligible under the factors employed by Social Security. The Plan's sole responsibility was to determine whether Giles's medical condition "arises out of League football activities," and the method by which Giles became "totally and permanently disabled" is irrelevant to that question. *See Giles I*, ECF 49 at 34 ("the method by which the player established his disability is irrelevant to the level of benefit to which he is entitled").

Contrary to the Plan's portrayal, the Social Security determination is of limited use in assessing whether Giles is entitled to Football Degenerative benefits. In evaluating a claimant such as Giles, the SSA need not decide—and did not decide—whether the underlying physical condition—to use the SSA's terms, Giles's "residual functional capacity"—resulted from injuries sustained during his professional football career, or from some other cause. Rather, the SSA's task was to consider the claimant's "symptoms (such as pain), signs, and laboratory findings together with other evidence [it] obtain[s,]" 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c), to determine "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs[.]" *Id.* § 200.00(c).

The Retirement Board has not attempted to apply the "arises out of League football activities" test to the SSA's assessment of Giles's medical condition or its classification of his "residual functional capacity." Rather, the Board "concede[d] that Mr. Giles is limited to

sedentary employment due to orthopedic impairments that arise out of League football activities." JVG000754. Nor does the Plan argue that Giles's physical condition has declined as a result of aging. To the contrary, it states: "There is no evidence of degenerating impairments over time." Plan Mem. at 17; *see also id.* at 10 (acknowledging that Giles's work limitations, which restricted him to sedentary work, had been "relatively stable over many years"); JVG000755 (letter of March 27, 2013, stating: "The Retirement Board . . . has never considered the mere passage of time or aging, *without a worsening or degeneration of the underlying football-caused medical impairments*, to 'arise out of League football activities.'"; "The Board found no evidence in the record that Mr. Giles's football-related impairments worsened or degenerated over time to make him unable to work.") (emphasis added).

Instead, the Plan focuses on one of three "vocational factors" that the SSA uses to determine whether a disability award is appropriate. In particular, the Retirement Board purports to determine whether the factor that "triggered" Giles's status as disabled pursuant to the SSA's regulations—in this instance, Giles's age—"arises out of League football activities." Yet analyzing whether a "vocational factor" such as age "arises out of League football activities" is an illusory exercise: age will never "arise[] out of League football activities."[16] In other words,

---

[16] Although the focus of this case is age, the Retirement Board's reasoning suggests that the SSA's other two "vocational factors"—education and work experience—are also appropriate targets for a "but for" analysis. *See* JVG000753 ("[T]he Retirement Board determined that the key inquiry is to identify the 'but for' cause of a Player's Social Security disability award."). To be sure, under the Plan's proffered reading that relies on the "trigger" concept, those factors typically would not be the final, last-in-time "trigger" that results in eligibility, given that they will likely remain constant over time. Even so, the Retirement Board's logic indicates it would be appropriate to subject those factors to a "but for" analysis. *See* JVG000753 ("[The Retirement Board] would reclassify Mr. Giles to the Football Degenerative category if the trigger for his Social Security award arose out of League football activities, but deny reclassification

the Plan's conclusion that a "vocational factor" used by the SSA—age—does not "arise[] out of League football activities" amounts to forcing a square peg into a round hole. As a practical matter, the Retirement Board's "analysis" of the SSA award serves to foreclose Football Degenerative benefits for players who, like Giles, become Social Security-eligible based in part on their age. In effect, the Board, having accepted, without qualification, the Social Security standard as an alternate basis for T&P disability benefits, has attempted to use the very factors that warrant a SSA disability award as a means to limit the resulting benefits due to Giles.

Moreover, the four principal cases on which the Plan relies, *see* Plan Mem. at 6 n.20, 17-18, all involve assessments of whether NFL football activities were the cause of a claimant's resulting medical condition. *See Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1179 (9th Cir. 2005) (upholding the Board's application of the "but for" standard to deny claim for Football Degenerative benefits where record contained conflicting medical reports regarding the source of former player's neurologic problems); *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136 (3d Cir. 2000) (former player alleged "that the NFL and its member teams condoned and/or supervised, *inter alia*, his abuse of alcohol for pain relief and, therefore, his alcohol-induced cardiomyopathy arose from a 'League football activity' within the meaning of the retirement plan"); *Youso v. Bert Bell NFL Player Ret. Plan*, 242 F.3d 379 (Table), 2000 WL 1670886, at *1 (8th Cir. Jan 5, 1999) (per curiam; unpublished) (Retirement Board did not abuse discretion in determining that former player's injuries did not arise from football, where player had suffered lower back injury while falling down a flight of stairs); *Webster v. Bert*

---

otherwise."). Just as the process of aging will never result from football, the other "vocational factors" of education and work experience also will not "arise[] out of League football activities."

*Bell/Pete Rozelle NFL Player Ret. Plan*, 129 F.3d 607 (Table), 1997 WL 680852, at *1 (5th Cir. Sept. 22, 1997) (per curiam; unpublished) (affirming denial of "football" level of benefits where former player's "medical records contain ample evidence that he first became totally disabled as a result of throat cancer, as well as other nonfootball related injuries"), *cert. denied*, 523 U.S. 1022 (1998). The Plan all but acknowledges the distinction between these prior cases and Giles's situation, as it recognizes that those cases involved disabilities that were "caused by non-football related *medical impairments*." *See* Plan Mem. at 16-17 (emphasis added). Rather than supporting the Plan's current reading of "[a]rising out of League football activities," these cases indicate that Giles's interpretation is the one most consistent with the Plan's prior decisions.

Nor has the Retirement Board shown how its interpretation adheres to the intent of the collective bargaining parties. *See* Giles Reply at 6 (citing JVG000753). In the denial letter of March 27, 2013, the Plan asserted, JVG000753:

> [T]he collective bargaining parties, who have sole authority to define the Plan's benefits, did not intend for a Player who is limited to sedentary work because of League football activities, and who receives an award of Social Security disability benefits due to a later change in status defined solely by rules established by the Social Security Administration, to receive Football Degenerative benefits.

The Plan, however, offers nothing to substantiate that claim. And, in that same paragraph, *see id.*, the Retirement Board stated that "the purpose of the collective bargaining parties [is] to give higher benefits to Players who have become disabled due to degenerative medical conditions that arise out of League football activities"—which, if anything, supports awarding the higher, Football Degenerative benefits to Giles.

Before concluding, I note that this decision does nothing to undermine several important limitations on the receipt of Football Degenerative benefits. First, regardless of whether a player

qualifies for T&P disability status under the General Standard or the Social Security Award standard, his medical condition must "arise[] out of League football activities" in order to receive Football Degenerative benefits. Accordingly, a player whose work limitation results from some other factor excluded under Plan § 6.4—such as an automobile accident or a chronic disease unrelated to football—will not qualify for benefits at the Football Degenerative level. *See* Plan § 6.4(c) ("'Arising out of League football activities' does not include . . . a disablement that would not qualify for benefits but for an *injury (or injuries) or illness* that arises out of other than League football activities."); *see also, e.g.*, *Youso*, 242 F.3d 379 (Table), 2000 WL 1670886, at *1 (upholding Retirement Board decision that injuries did not arise from football, where player had suffered lower back injury while falling down a flight of stairs); *Webster*, 129 F.3d 607 (Table), 1997 WL 680852, at *1 (affirming denial of "football" level of benefits where player's "medical records contain ample evidence that he first became totally disabled as a result of throat cancer, as well as other nonfootball related injuries").

Second, the Plan expressly restricts Football Degenerative benefits to those players whose total and permanent disability emerges no more than fifteen years after the player's last credited NFL season. Plan § 5.1(c); *see also* Plan § 5.1(d) (stating that where disability "arises out of League football activities" and results in total and permanent disability 15 or more years after player's last credited NFL season, Inactive benefits are awarded). That restriction has the effect of preventing players from receiving Football Degenerative benefits where the total and permanent disability does not emerge until a specified date falling well after the end of the player's NFL career, which presumably helps to safeguard the Plan from paying that higher level of benefits to players whose injuries follow less directly from their "League football activities."

Here, however, neither party disputes that Giles's total and permanent disability arose within fifteen years of his last credited NFL season.

Further, in reaching my conclusion, I am cognizant of the deference owed to the Retirement Board's determination. *See, e.g.*, *Evans*, 514 F.3d at 322. Its discretion, however, is not without limit. The Retirement Board's decision must be reasonable, *see id.*, and it is not entitled to reach a decision inconsistent with the Plan's plain language. *Blackshear*, 509 F.3d at 639.

The Plan's latest rationale for denying Football Degenerative benefits to Giles amounts to a "Hail Mary" pass. In *Giles I*, I concluded that the Plan, having contractually agreed to adopt the Social Security Awards standard for benefits, improperly sought to curtail that provision by adding a requirement—proof of a total inability to work—that was contrary to the Plan's plain language. *See* ECF 49 at 37. The Plan has now conceded that Giles's work limitation resulted from his NFL football activities, and not from an illness, injury, or other cause. Despite that acknowledgment, the Plan has sought to salvage its denial by adding a requirement that Giles's disabled status under the SSA criteria must have "arise[n] out of League football activities." The Retirement Board has denied Football Degenerative benefits because Giles, although physically limited to sedentary work due to injuries sustained during his NFL career, qualified for Social Security disability benefits based in part on his age. Because that limitation is contrary to the Plan, reversal is warranted.

## D. Remedy

Although I remanded this case following *Giles I*, "remand is not required, particularly in cases in which evidence shows that the administrator abused its discretion." *Helton v. AT&T*

*Inc.*, 709 F.3d 343 (4th Cir. 2013) (citing, *inter alia*, *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993) ("[A] remand for further action is unnecessary here because the evidence clearly shows that [the ERISA plan administrator] abused its discretion."); *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir. 1985) ("remand should be used sparingly")). In their cross-motions for summary judgment, neither party sought remand.  And, based on the Plan's prior determination, there is no further analysis the Plan must undertake that would justify remand.

### III.  Conclusion

For the foregoing reasons, summary judgment is granted in favor of plaintiff by the Order that accompanies this Memorandum Opinion.


Date:   December 31, 2013                    _____/s/_____
                                             Ellen Lipton Hollander
                                             United States District Judge